Michael BOWERS, Plaintiff,

v.

NATIONAL COLLEGIATE ATHLETIC ASSOCIATION, ACT, Inc., NCAA Initial–Eligibility Clearinghouse, Temple University of the Commonwealth System of Higher Education, University of Iowa, American International College, Defendants.

No. CIV.A.97–2600.

United States District Court, D. New Jersey.

Nov. 2, 2000.

Barbara E. Ransom, Public Interest Law Center of Philadelphia, Philadelphia, PA, and Richard L. Bazelon, Bazelon & Less, Marlton, NJ, for Michael Bowers.

Charles J. Vinicombe, Princeton, NJ, J. Freedley Hunsicker, Jr., John Schultz, Julianne Peck, Amy E. Pizzutillo, Drinker,

Biddle & Shanley LLP, Princeton, NJ, for National Collegiate Athletic Association.

Robert A. Burgoyne, Karen M. Moran, Fulbright & Jaworski LLP, Washington, DC, Nicholas M. Kouletsis, Pepper, Hamilton, LLP, Cherry Hill, NJ, for ACT, Inc., NCAA Initial Eligibility Clearinghouse.

Mark Schantz, Andrew Ives, Office of the General Counsel of the University of Iowa, Iowa City, IA, Thomas J. Miller, Attorney General, Gordon E. Allen, Deputy Attorney General, Office of the Iowa Attorney General, Des Moines, IA, William O. Perkins, Jr., Jersey City, NJ, Margulies, Wind, Herrington & Knopf, P.C., Jersey City, NJ, for University of Iowa.

John B. Langel, Abigail L. Flitter, Ballard Spahr Andrews & Ingersoll, LLP, Philadelphia, PA, for Temple University of the Commonwealth System of Higher Education.

Thomas C. Hart, Ruprecht & Hart, LLP, Millburn, NJ, for American International College.

OPINION

ORLOFSKY, District Judge.

Table of Contents

I. Preliminary Matters ................................................. 500

 A. Standing to Seek Injunctive Relief ................................. 500
 B. Recoverability of Damages ........................................ 503

II. Discussion........................................................ 510

 A. Legal Standard for Summary Judgment ............................. 510
 B. ADA Claims..................................................... 510
 1. Title II Claims Against Temple and Iowa........................... 511
 2. Title III Claims Against the NCAA and AIC........................ 514
 a. "By any person who owns, leases (or leases to), or operates a place of public accommodation" .................................. 514
 b. "Discriminated against on the basis of disability" .................. 517
 i. Eligibility Criteria ...................................... 518
 ii. Reasonable Modification/Fundamentally Alter ................ 519

 C. Claims Under the Rehabilitation Act ................................ 525
 1. "Receiving Federal financial assistance" .......................... 525
 a. The NCAA........................................... 525
 b. ACT/Clearinghouse ................................... 530
 2. "Otherwise qualified individual"/"Solely by reason of his or her disability" ................................................. 533
 D. The NJLAD..................................................... 533
 E. Breach of Contract Claim ......................................... 535

III. Conclusion ....................................................... 537

This hotly contested case presents difficult legal questions in an area of the law that has become fertile ground for civil rights litigation: the applicability of laws prohibiting disability-based discrimination to the practices of the National Collegiate Athletic Association ("NCAA"). In this case, Plaintiff Michael Bowers ("Bowers") has sued the NCAA under the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101 et seq., section 504 of the Rehabilitation Act ("ACT"), 29 U.S.C. § 794(a), and the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. 10:5-1 et seq. Among other claims, Bowers alleges that the NCAA discriminates against the learning disabled through initial eligibility requirements that govern whether a student may participate in intercollegiate college

athletics. Many of the legal issues raised in this case are difficult and present no obvious resolution. Some of those challenging issues include: (1) Whether Bowers may seek injunctive relief although he has already enrolled in college; (2) Whether money damages are available under the Rehabilitation Act; (3) Whether the NCAA is a place of public accommodation under the ADA; (4) Whether the NCAA's eligibility requirements are "necessary" under ADA analysis; (5) Whether the NCAA's waiver review process is a reasonable accommodation for Bowers; (6) Whether Bowers is an otherwise qualified individual; (7) Whether the NCAA is a recipient of federal funding under the Rehabilitation Act; and (8) Whether the NJLAD is applicable when an individual seeks access to a public accommodation outside of New Jersey.

Bowers specifically targets the NCAA's regulations that prohibit first-year college students from participating in Division I and Division II athletic programs if they failed as high school students to complete a core academic curriculum specified by the NCAA. The NCAA requires high school students to complete thirteen "core courses" in subject areas including English, mathematics, and the social and physical sciences before they may be declared "qualifiers," student-athletes permitted to practice and compete as members of intercollegiate teams and to receive college athletic scholarships.[1] Bowers, who suffers from a learning disability, completed a number of classes in high school that were designated special education classes. The NCAA ruled that these classes did not satisfy its core course requirement and declared Bowers, who was a high school standout in football, a "nonqualifier." Bowers alleges that the NCAA discriminated against him because of his disability in declaring him ineligible to participate in intercollegiate athletics as a college freshman.

Bowers has also sued Temple University ("Temple"), the University of Iowa ("Iowa"), and American International College ("AIC") for discrimination on the ground that these schools stopped recruiting Bowers to play football when they concluded that his learning disability would likely result in the NCAA declaring him a nonqualifier. Similarly, Bowers has sued ACT, Inc. and the NCAA Initial–Eligibility Clearinghouse ("ACT/Clearinghouse"). The Clearinghouse, which is operated by ACT, is responsible for making eligibility determinations pursuant to the NCAA's regulations. Bowers has also alleged a breach of contract claim against ACT/Clearinghouse, to whom Bowers paid an $18.00 fee for the processing of his eligibility materials. A complete discussion of the factual and procedural background in this case can be found in two prior opinions of this Court. *See Bowers v. NCAA,* 974 F.Supp. 459 (D.N.J.1997) (Orlofsky, J.) (*Bowers I* ); *Bowers v. NCAA,* 9 F.Supp.2d 460 (D.N.J.1998) (Orlofsky, J.) (*Bowers II* ). The Court exercises jurisdiction in this case pursuant to 28 U.S.C. §§ 1331, 1343, and 1367.

As my discussion below indicates, I have concluded, among other things, that: (1) Bowers is still suffering from the adverse effects of the NCAA's regulations in a way which confers standing to seek injunctive relief; (2) Money damages are available under the Rehabilitation Act if intentional discrimination is alleged; (3) The NCAA is a place of public accommodation under the ADA; (4) There is insufficient evidence in the summary judgment record to allow me to determine as a matter of law that the NCAA's eligibility requirements are "necessary" within the meaning of the ADA; (5) The waiver review process undertaken by the NCAA on behalf of Bowers was not a reasonable accommodation; (6) There are still genuine issues of material fact regarding whether Bowers is an otherwise qualified individual; (7) The NCAA is not

---

1. This is a description of the NCAA's core course requirement as it existed in 1995–1996, the period in which Bowers originally applied for eligibility.

entitled to summary judgment on its claim that it is not a recipient of federal funding under the Rehabilitation Act; and (8) There is insufficient evidence in the summary judgment record for me to determine whether the NJLAD is applicable when an individual seeks access to a public accommodation outside of New Jersey.

Accordingly, for the reasons set forth below, the motions of the NCAA, AIC, Temple and Iowa for summary judgment on Count I(ADA) will be denied; the motions for summary judgment of the NCAA, Temple, Iowa and AIC on Count II (Rehabilitation Act) will be denied; the motion of ACT/Clearinghouse for summary judgment on Count II (Rehabilitation Act) will be granted; the motions for summary judgment of the NCAA and ACT/Clearinghouse on Count IV (NJLAD) will be denied without prejudice; and ACT/Clearinghouse's motion for summary judgment on Count VI (Breach of Contract) will be granted. Additionally, I will deny the mo-

tions for summary judgment on the issues of standing and the recoverability of damages, with the exception that I will grant summary judgment on the issue that certain damages sought by Bowers are too speculative. Also, I will defer my decision regarding whether Bowers may recover compensatory damages against Temple and Iowa until Bowers's pending motion to amend his First Amended Complaint is resolved.

## I. PRELIMINARY MATTERS

### A. Standing to Seek Injunctive Relief

Bowers seeks a wide range of equitable relief.[2] If granted, the relief sought would restore Bowers to the position he would have been in had he been declared a "qualifier" in his senior year of high school [3] and would also require the NCAA, ACT and the Clearinghouse to make certain programmatic changes to the way in which freshman eligibility is determined.[4] First .

---

**2.** Bowers seeks equitable relief under his ADA and Rehabilitation Act claims only. *See* First Am. Compl. at 24, 28–29; *see also Bowers II,* 9 F.Supp.2d at 472 (finding that Bowers does not seek equitable relief under his NJLAD claim).

**3.** Bowers seeks the following equitable relief which, if granted, would place him in the position he would have been in had he been declared eligible as a freshman:

1. Defendants shall be permanently enjoined from declaring Plaintiff ineligible or otherwise unqualified to receive the full benefits of an athletic scholarship to a Division I or Division II school and from prohibiting him the right to participate in football competition at a Division I or Division II school.

2. Defendants shall accept Plaintiff's IEP-mandated courses which contain 75% or more academic content as qualified to meet the "core course" requirements.

3. Defendants shall accept Plaintiff's SAT scores which were obtained under test conditions as identified in his IEP and approved by the Educational Testing Service.

\* \* \* \* \* \*

5. Defendants shall restore Plaintiff's eligibility status to five years to enable him to receive a full tuition athletic scholarship at a Division I or Division II school and trans-

fer that eligibility to a school of his choice with no restrictions.

6. Defendants shall support Plaintiff in the application process to a school of his choice by instructing its member institution [sic] to give Plaintiff's application for an athletic scholarship the same regard as that of an entering freshman, and without the restrictions that are imposed on transferring students.

First Am. Compl. at 24, 28–29.

**4.** The following equitable relief, if granted, would require the NCAA, the ACT and the NCAA Clearinghouse to make certain programmatic changes to the way in which freshman eligibility is determined:

7. Defendants shall establish a unit within the Clearinghouse staffed with persons educated in and current on the requirements of the Individuals with Disabilities Education Act, and Section 504 of the Rehabilitation Act and accompanying regulations currently in effect or which may be effected that impact the education of persons with disabilities, and such unit shall review the applications of the students with disabilities to ensure that such applications are not discriminated against solely on the basis of disability at no additional cost to the applicant.

Amended Compl. at 24, 28–29. Iowa, AIC, Temple, and the NCAA assert that Bowers does not have standing to seek such equitable relief and that developments in the case since it was filed render Bowers's claims for injunctive relief moot. NCAA Mem. Supp. Summ. J. at 18–22. Not surprisingly, Bowers disagrees. Pl.'s Resp. to Mots. Summ. J. at 36–40.

■ As the United States Supreme Court has previously noted: "It goes without saying that those who seek to invoke the jurisdiction of the federal courts must satisfy the threshold requirement imposed by Article III of the Constitution by alleging an actual case or controversy." *City of Los Angeles v. Lyons*, 461 U.S. 95, 101, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983). "The 'irreducible constitutional minimum of standing' has three parts: injury in fact (a concrete harm suffered by the plaintiff that is actual or imminent), causation, and redressibility." *Doe v. National Bd. of Med. Examiners*, 199 F.3d 146, 152 (3d Cir.1999) (citing *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560, 112 S.Ct. 2130, 119 L.Ed.2d 351(1992)). "The party invoking federal jurisdiction bears the burden of establishing these elements." *Lujan*, 504 U.S. at 561, 112 S.Ct. 2130. Consequently, a plaintiff faced with a motion for summary judgment cannot rest on mere allegations to defeat such a motion but must set forth, by affidavit or other evidence, specific facts which for the purposes of the summary judgment motion will be taken to be true. *Id.* Evidence that the plaintiff suffered some past exposure to illegal conduct will not in itself show a present case or controversy warranting injunctive relief " 'if unaccompanied by any continuing, present adverse effects.' " *Lyons*, 461

U.S. at 102, 103 S.Ct. 1660 (quoting *O'Shea v. Littleton*, 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974)).

■ The core of the standing dispute between Bowers and the Defendants concerns the final prong of the tripartite standing requirement, "redressibility." The parties disagree about whether Bowers will ever again confront the discrimination that is the basis of his Complaint and Amended Complaint and whether, as a result, there is any continuing injury to be redressed through the granting of injunctive relief. The Defendants argue that Bowers is no longer subject to the NCAA's freshman eligibility requirements because he has already enrolled as a freshman in a college program. NCAA Mem. Supp. Summ. J. at 20–21. Bowers asserts that he is still subject to the NCAA's freshman eligibility requirements because, although he has completed at least a semester's worth of work at Temple, he has not completed a full academic year. Pl.'s Resp. to Mots. Summ. J. at 38–39.

Neither side points to evidence probative of whether the NCAA's rules concerning freshman eligibility are applicable to students who have begun, but not completed, their first year of college. Under the NCAA bylaws, college athletes are entitled to five years of athletic eligibility, and these five years of eligibility are counted from the first day that a student-athlete attends classes. Exhibits of Defs., Ex. 50 (NCAA Bylaw 14.2.1.1). Simply because the NCAA calculates a student athlete's five years of eligibility from his or her first day of classes, however, does not necessarily mean that someone who begins but does not complete his or her freshman

8. Defendants shall establish an administrative review process to enable parents of students with learning disabilities and students with learning disabilities to review materials submitted on the student's behalf to the Clearinghouse, to collect and supplement such information and to appeal the decision of the Clearinghouse when he or is determined to be a "non-qualifier" or a "partial qualifier."

9. Defendants shall establish a procedure that would enable a student with a disability to be certified by the Clearinghouse without requiring him/her to complete unduly burdensome procedures that would not be imposed on a student who does not have a disability.
First Am. Compl. at 29.

year of college, without ever having played intercollegiate athletics, can never again be considered a freshman for eligibility purposes. There is no conclusive evidence in the summary judgment record indicating whether or not the NCAA would consider someone who has merely begun a college program to be a freshmen for purposes of initial eligibility. Because Bowers is the party invoking federal jurisdiction and bears the burden of establishing standing, *see Lujan,* 504 U.S. at 561, 112 S.Ct. 2130, his failure to demonstrate that he is likely to be subject to the NCAA's initial eligibility requirements again is fatal to his attempt to establish standing on this ground.

That being said, however, there is an alternate ground upon which standing can be found in this case. In focusing on the question of whether or not Bowers is likely to be subject to the NCAA's initial eligibility requirements again, both Bowers and the Defendants overlook a more obvious basis for standing to seek injunctive relief in this case, namely, that Bowers is suffering from "continuing, present adverse effects," *Lyons,* 461 U.S. at 102, 103 S.Ct. 1660, of the NCAA's decision to declare him ineligible to play football as a freshman. In being declared ineligible for his freshman year, Bowers lost a year of athletic eligibility. His current remaining eligibility is one year less than it would be if Bowers had not been declared ineligible at the end of his senior year of high school. In this way, Bowers continues to suffer from the adverse consequences of being declared ineligible as a freshman. *See O'Shea v. Littleton,* 414 U.S. 488, 495–96, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974) (indicating that plaintiffs would have standing to seek injunctive relief against local judges accused of imposing sentences illegally if they had been serving allegedly illegal sentences at time of suit), *cited in Davis v. Thornburgh,* 903 F.2d 212, 226–27 & n. 7 (3d Cir.1990) (Becker, J., concurring

in part and dissenting in part); *see also Phillips v. County of Bucks,* No. CIV. A. 98–6415, 1999 WL 600541 (E.D.Pa. August 9, 1999) ("When a plaintiff seeks an injunction, standing is afforded only when the plaintiff has suffered from the defendant's alleged conduct and that suffering continues").

That Bowers has standing to sue for injunctive relief is made clear by a case cited in the NCAA's brief in support of the opposite proposition. In *Dennin v. Connecticut Interscholastic Athletic Conference, Inc.,* 94 F.3d 96 (2d Cir.1996), the Connecticut Interscholastic Athletic Conference ("CIAC") sought review of a District Court decision granting Dennin an injunction which permitted him to swim for his high school team. *Id.* at 98. At issue in that case was a regulation that allowed high school athletes whose schools competed in the CIAC to participate in interscholastic competition only until they were nineteen-years-old. *Id.* Dennin was learning disabled and started high school when he was sixteen-years-old. *Id.* at 98–99. As a result, he would be ineligible to swim for his high school team in his senior year because he would be nineteen-years-old at the time. *Id.* The CIAC's appeal of the District Court's decision was decided only after Dennin's senior swim season had ended, with Dennin having had participated throughout the season. *Id.* at 100. The Second Circuit held that the appeal was moot, stating that there was " 'no live controversy' " between Dennin and the CIAC for the Court to decide. *Id.* First, Dennin's season had ended. *Id.* Second, Dennin gave every indication that he would not seek a waiver from the CIAC seeking permission to swim for his high school for a fifth season.[5] *Id.* at 101. Specifically, he did not seek relief concerning a CIAC rule that limits participation in athletics between the tenth and twelfth grades to three years, a rule that would

---

5. Because of his disability, Dennin required five years to complete high school. *Dennin,*

94 F.3d at 99.

also have to be waived or the operation of which would have to be enjoined for Dennin to compete for a fifth year. *Id.* Because the regulation barring competition by nineteen-year-old student-athletes could not reasonably be expected to be applied against Dennin again, the Court ruled that it could not decide the CIAC's appeal on the merits. *Id.*

Putting aside that *Dennin* differs from this case in several significant respects— that case concerned a circuit court's ability to rule on an appeal and the mootness and "capable of repetition, yet evading review" doctrines—it is instructive in this case. At the time the Second Circuit decided the CIAC's appeal, Dennin was not suffering from any adverse effects as a result of the CIAC rule prohibiting his competing during his senior year because he had already competed in his senior year. In this case, Bowers's eligibility has not elapsed and remains shorter than it would otherwise be as a result of his being declared a "nonqualifier" as a freshman. In other words, there is a "live controversy" to be decided in this case in a way there was not in *Dennin.* In addition, Dennin failed to seek relief from the three-season rule which would have barred his participation in interscholastic swim meets if he sought to swim for his high school in his fifth year.

In this case, Bowers, by requesting to be returned to a full five years of eligibility, effectively seeks a waiver of any other rule that might prevent standing in this case. For example, even if I were to find that the way in which the NCAA counts a student-athlete's years of eligibility is evidence that the NCAA's initial eligibility requirements will never be applicable to Bowers again, Bowers, at least implicitly, seems to seek relief from the operation of this rule as well. The Supreme Court has described the value of the standing doctrine this way: "It tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic appreciation of the consequences of judicial action." *Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.,* 454 U.S. 464, 472, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). By reaching the merits of the summary judgment motions of the Defendants, I am in no way deciding this case in the rarified atmosphere of a debating society.

That being said, it is not clear that Bowers has standing to pursue all of the injunctive relief he seeks. Specifically, Bowers does not have standing to seek relief which calls for programmatic changes to the ways in which the NCAA, ACT, and the Clearinghouse determine freshman eligibility. Bowers has standing in this case because he continues to be prejudiced by the NCAA's determination concerning his freshman eligibility, not because the NCAA's eligibility rules are likely to be applied against him in the future. Moreover, this case does not involve a class action in which it might be said that other members of the class are likely to be subject to the NCAA's initial eligibility rules in the future. Under such circumstances, Bowers can only seek relief that is necessary to his individual claim. *See Bartlett v. New York State Bd. of Law Examiners,* 970 F.Supp. 1094, 1147 (S.D.N.Y.1997) ("this is not a class action, and plaintiff does not have standing to seek declaratory relief, or any relief beyond that relief necessary to remedy her individual claim"), *aff'd in part, vacated in part, Bartlett v. New York State Bd. of Law Examiners,* 156 F.3d 321 (2nd Cir. 1998). As a result, Bowers can only seek relief that will confer upon him a full five years of eligibility and not relief that will change the way in which the NCAA, ACT, and the Clearinghouse make determinations of freshman eligibility.

## B. Recoverability of Damages

Even if Bowers did not have standing to pursue injunctive relief, his claims would not necessarily be barred because

he also seeks monetary damages. First Am. Compl. at 24, 28–29, 38. The NCAA argues, however, that compensatory damages are unavailable under section 504 of the Rehabilitation Act. NCAA Mem. Supp. Summ. J. at 35–37. In addition, the NCAA contends that even if damages were available under the Rehabilitation Act, such damages would not be available in this case because the NCAA did not cause Bowers any injuries and the damages Bowers seeks are "unduly speculative." *Id.* at 50–55.[6]

Whether or not money damages are available under section 504 of the Rehabilitation Act presents a complex question. While the Third Circuit has held that money damages are available through private action under this provision, *see W.B. v. Matula*, 67 F.3d 484, 494 (3d Cir.1995) (holding that money damages are available under section 504 of the Rehabilitation Act), the Third Circuit has not confronted the more difficult issue of whether such relief is available only in cases where intentional discrimination is alleged or whether such relief is also available in disparate impact cases. Most courts nationally have held that damages are available under section 504 only in intentional discrimination cases. *See, e.g., Ferguson v. City of Phoenix*, 157 F.3d 668, 674 (9th Cir.1998) (holding that monetary damages are available under Title II of the ADA and section 504 of the Rehabilitation Act only upon a showing of intentional discrimination); *Wood v. President and Trustees of Spring Hill College*, 978 F.2d 1214, 1219–20 (11th Cir.1992) (stating that monetary damages are not available for unintentional violations of section 504 of the Rehabilitation Act); *Carter v. Orleans Parish Pub. Sch.*, 725 F.2d 261, 264 (5th Cir.1984) (same); *Marvin H. v. Austin Indep. Sch. Dist.*, 714 F.2d 1348, 1356–57 (5th Cir.1983) (same); *Matthews v. Jefferson*, 29 F.Supp.2d 525, 535–36 (W.D.Ark. 1998) (requiring a showing of intentional discrimination under both Title II and section 504 for compensatory damages to be available); *Tanberg v. Weld County Sheriff*, 787 F.Supp. 970, 973 (D.Colo.1992) (holding that compensatory damages are available for intentional violations of the Rehabilitation Act).

I agree that compensatory damages are available under section 504 of the Rehabilitation Act only in cases where intentional discrimination is alleged. Congress has mandated that the remedies available to disabled persons alleging violations of section 504 of the Rehabilitation Act be the same as the remedies afforded under Title VI of the Civil Rights Act of 1964. *See* 29 U.S.C. § 794a(a)(2). In *Guardians Ass'n v. Civil Service Comm'n*, 463 U.S. 582, 103

**6.** Iowa joins the NCAA in arguing that compensatory damages are unavailable under section 504 of the Rehabilitation Act. University of Iowa's Mot. for Summ. J. at 17–18. Iowa further maintains that compensatory damages are not available under Title II of the ADA. *Id.* I will not, however, reach Iowa's arguments on this motion for summary judgment. Bowers's First Amended Complaint, the version of Bowers's Complaint upon which the motions for summary judgment currently before the Court are based, indicates that compensatory damages under the Rehabilitation Act and the ADA are sought only against the NCAA, ACT, and the Clearinghouse. First Am. Compl. at 24, 29. Recognizing that he failed to seek compensatory damages against Iowa and Temple, Bowers has filed a motion to amend his First Amended Complaint on the eve of the deadline established for the filing of dispositive motions to reflect that he seeks damages against these defendants as well. Proposed Second Am. Compl. at 24, 29. I have not yet ruled on Bowers's motion to amend and will defer consideration of whether or not compensatory damages can be recovered against Iowa and Temple until I do so. In briefs submitted in support of and against Bowers's motion to amend, all of the affected parties, not only Iowa, address this issue at length. In addition, the parties will suffer no prejudice if I wait until I rule on Bowers's *motion to Amend to address this issue.*

Because all parties agree that only injunctive relief is available under Title III of the ADA, *see* Pl.'s Resp. to Mots. Summ. J. at 40 n.6, I shall not address whether the NCAA and AIC are liable for compensatory damages under this provision. *See Bowers II*, 9 F.Supp.2d at 474 (holding that Title III is the provision applicable to Bowers's ADA claims against ACT and AIC).

S.Ct. 3221, 77 L.Ed.2d 866 (1983), the Supreme Court considered the circumstances under which compensatory damages are available for violations of Title VI. While recognizing that federal courts typically possess wide-ranging discretion in fashioning relief for the invasion of legal rights, the Court noted that relief afforded for violations of statutes enacted pursuant to the Congress's authority under the Spending Clause of the Constitution is typically limited to declaratory and injunctive relief. *See Guardians Ass'n,* 463 U.S. at 596, 103 S.Ct. 3221 (citing *Pennhurst State Sch. & Hosp. v. Halderman,* 451 U.S. 1, 15, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)). In *Pennhurst State Sch. & Hosp.,*the Court explained:

> [L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions. The legitimacy of Congress's power to legislate under the spending power thus rests on whether the State voluntarily and knowingly accepts the terms of the "contract." There can, of course, be no knowing acceptance if a State is unaware of the conditions or is unable to ascertain what is expected of it.

*Pennhurst State Sch. & Hosp.,* 451 U.S. at 17, 101 S.Ct. 1531 (citations omitted). Where a private suit results in liability that essentially represents a change in the conditions attached to the receipt of federal funds, damages are not appropriate because the party held liable for violating

these new conditions had no notice of them and should have the opportunity to terminate its receipt of the federal funds instead of bearing the attendant unanticipated burdens. *See Guardians Ass'n,* 463 U.S. at 596–97, 103 S.Ct. 3221. *See also Davis v. Monroe County Bd. of Ed.,* 526 U.S. 629, 119 S.Ct. 1661, 143 L.Ed.2d 839 (1999) ("private damages actions are available [where Spending Clause laws are violated] only where recipients of federal funding had adequate notice that they would be liable for the conduct at issue"); *Franklin v. Gwinnett County Public Sch.,* 503 U.S. 60, 112 S.Ct. 1028, 117 L.Ed.2d 208 (1992) ("The point of not permitting monetary damages for an unintentional violation is that the receiving entity of federal funds lacks notice that it will be liable for a monetary award"). Finding that Title VI was enacted pursuant to Congress's Spending Clause power and that Congress did not intend to override the presumption that damages are generally not available for violations of such legislation, the Court concluded that "compensatory relief . . . is not available as a private remedy for Title VI violations not involving intentional discrimination." *Guardians Ass'n,* 463 U.S. at 602–03, 103 S.Ct. 3221. Money damages are available, however, in cases of intentional discrimination because "there can be no question as to what the recipient's obligation under the program [is] and no question that the recipient [is] aware of that obligation." *Id.* at 597, 103 S.Ct. 3221.[7]

7. Although *Guardians Ass'n* generated six opinions, not one of which was adopted by a majority of the Court, "a clear majority expressed the view that damages were available under Title VI in an action seeking remedies for an intentional violation." *Franklin,* 503 U.S. at 70, 112 S.Ct. 1028. *See also Marvin H.,* 714 F.2d at 1357 (stating that in *Guardians Ass'n* "at least five justices agree that there can be no private right of action under Title VI for damages absent intentional discrimination by the defendants"). Subsequent Supreme Court decisions have been consistent with the Court's holding in *Guardians Ass'n.* In *Franklin,* the Supreme Court addressed the issue of whether money damages

are available for violations of Title IX, a law enacted pursuant to Congress's Spending Clause power that prohibits certain forms of gender-based discrimination. 503 U.S. at 62–63, 74–75, 112 S.Ct. 1028; *See also Davis,* 119 S.Ct. at 1669–70 (holding that Title IX was enacted pursuant to Congress's Spending Clause authority). Noting that the full panoply of remedies are typically available to redress violations of legal rights, the Court concluded that money damages were available to provide relief for violations of Title IX. *Id.* at 66, 73, 76, 112 S.Ct. 1028. The decision in *Franklin* is consistent with the Court's holding in *Guardian's Ass'n* because the Court in

**506**

Like Title VI, section 504 of the Rehabilitation Act is Spending Clause legislation. *See Shinault v. American Airlines, Inc.,* 936 F.2d 796, 802 (5th Cir.1991); *Armstrong v. Wilson,* 942 F.Supp. 1252, 1263 (N.D.Cal.1996); *Moreno v. Consol. Rail Corp.,* 909 F.Supp. 480, 487 (E.D.Mich. 1994), *aff'd en banc,* 99 F.3d 782 (6th Cir. 1996); *Rivera Flores v. Puerto Rico Telephone Co.,* 776 F.Supp. 61, 67 (D.P.R. 1991); *Turner v. First Hosp. Corp.,* 772 F.Supp. 284, 287 n. 2 (E.D.Va.1991); *Bradford v. Iron County C–4 Sch. Dist.,* No. 82–303–C(4), 1984 WL 1443, *7 (E.D.Mo. 1984); *Ruth Anne M. v. Alvin Indep. Sch. Dist.,* 532 F.Supp. 460, 470 n. 8 (S.D.Tex. 1982). *See generally* James Leonard, *A Damaged Remedy: Disability Discrimination Claims Against State Entities Under the Americans with Disabilities Act after Seminole Tribe and Flores,* 41 Ariz. Law Rev. 651, 656 (1999) ("Section 504 either was or could have been enacted under Congress' Spending Clause power"); Judith Welch Wegner, *The Antidiscrimination Model Reconsidered: Ensuring Equal Opportunity without Respect to Handicap under Section 504 of the Rehabilitation Act of 1973,* 69 Cornell L.Rev. 401, 421–26 (1984) (stating that section 504 was enacted pursuant to Congress's authority under both the Spending Clause and the Enforcement Clause of the 14th Amendment).

Admittedly, there is some dispute about whether section 504 was enacted pursuant to Congress's Spending Clause authority or Congress's power under the Enforcement Clause of the Fourteenth Amendment. *See Clark v. California,* 123 F.3d 1267, 1270 (9th Cir.1997) (holding that section 504 is a valid exercise of Congress's authority under the Enforcement Clause of the Fourteenth Amendment); *Mayer v. University of Minn.,* 940 F.Supp. 1474, 1476–1480 (D.Minn.1996) (same); *River Forest Sch. Dist. No. 90 v. Illinois State*

*Bd. of Educ.,* No. 95 C 5353, 1996 WL 89055, at *6 (N.D.Ill. February 28, 1996) (citing *Byrne v. Bd. of Educ. of West–Allis,* 89 C 163, 1989 WL 120646 (E.D.Wis. June 26, 1989) and stating that section 504 was enacted pursuant to section 5 of the Fourteenth Amendment). This ambiguity stems in part from Congress's failure to indicate the power under which it enacted section 504. *Armstrong,* 942 F.Supp. at 1262. The Supreme Court's decision in *Atascadero State Hosp. v. Scanlon,* 473 U.S. 234, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985), which is frequently cited by courts identifying the Enforcement Clause as the source of Congress's authority to enact section 504, *see, e.g., Clark v. California,* 123 F.3d at 1271; *Mayer,* 940 F.Supp. at 1478; *River Forest Sch. Dist. No. 90,* 1996 WL 89055 at *6, has added to this confusion. In *Atascadero State Hosp.,* however, the Supreme Court assumed without deciding that section 504 was enacted pursuant to Congress's power under section 5 of the Fourteenth Amendment. 473 U.S. at 243–44 & n. 4, 105 S.Ct. 3142. The Court did not need to reach the question of whether section 504 was enacted pursuant to the Spending Clause or the Enforcement Clause because the parties in that case conceded that section 504 was enacted under Congress's Enforcement Clause authority. *Id.* Furthermore, *Atascadero State Hosp.,* and the cases that have applied it, have discussed the authority under which section 504 was enacted in an entirely different context than the one presented here. Those cases involved attempts to determine whether Congress effectively abrogated Eleventh Amendment state sovereign immunity in adopting section 504.

In the end, one need only look at the language of section 504, which conditions the application of its bar against discrimination on the receipt of federal funds, and the fact that section 504 is modeled after

*Franklin* was concerned with intentional discrimination. *Id.* at 74–75, 112 S.Ct. 1028 ("This notice problem does not arise in a case such as this in which intentional discrimina-

tion is alleged."). *See also Ferguson,* 157 F.3d at 674 (stating that the holding in *Guardians Ass'n* was undisturbed by *Franklin* and that the two opinions are consistent).

Title VI, which was enacted in part under Congress's Spending Clause power, *see* 110 Cong. Rec. 6546 (1964) (statement of Sen. Humphrey)("[Title VI] is not a regulatory measure, but an exercise of the unquestioned power of the Federal Government to 'fix the terms on which Federal funds shall be disbursed'.... No recipient is required to accept Federal aid. If he does so voluntarily, he must take it on the conditions on which it is offered"), to conclude that section 504 was enacted at least in some measure pursuant Congress's authority under the Spending Clause. Indeed, even if persuasive arguments could be offered that section 504 was enacted pursuant to Congress's Enforcement Clause power, there is no reason why the Enforcement Clause must be considered the only source of authority under which section 504 was enacted, see *Anisimov v. Lake,* 982 F.Supp. 531, 533 (N.D.Ill.1997); *In re Straight,* 209 B.R. 540, 548 (D.Wyo.1997) (interpreting *Hurd v. Pittsburg State University,* 109 F.3d 1540 (10th Cir.1997)); *Armstrong,* 942 F.Supp. at 1263, and the plain language of section 504 indicates that the Spending Clause was at least in part the authority Congress relied upon in enacting section 504.

Given that no evidence has been presented that Congress intended to override the presumption that compensatory damages are not available for violations of Spending Clause legislation, I join the majority of courts who have addressed this question and hold that compensatory damages are not available for violations of section 504 absent a showing of intentional discrimination.

■ That being said, whether or not the NCAA is entitled to summary judgment with respect to compensatory damages under section 504 depends entirely on whether Bowers has alleged intentional discrimination against the NCAA. The NCAA contends that Bowers's claim is, at most, a disparate impact claim which contains no allegations of intentional discrimi-

nation on the part of the NCAA. NCAA Mem. Supp. Summ. J. at 36. Bowers, obviously, disagrees. Pl.'s Resp. to Mots. Summ. J. at 40–45.

There is some evidence in the summary judgment record that supports the NCAA's position. Bowers's First Amended Complaint, for example, is dotted with language that suggests that Bowers is not concerned with intentional discrimination on the part of the NCAA but rather with the impact or effect that the NCAA's initial eligibility rules have on the learning disabled. Bowers alleges that the NCAA's core course requirement "has [an] *adverse and disparate impact* on students with disabilities who take special education courses." First Am. Compl. ¶ 29 (emphasis added). He also alleges that the NCAA, the Clearinghouse, and ACT have established and enforced initial eligibility requirements that "tend to screen out" students with learning disabilities. *See id.* ¶¶ 32, 50. It is no surprise, then, that Bowers, in papers submitted in support of his motion to amend his First Amended Complaint, describes his own allegations as concerning the "discriminatory impact" that the NCAA's initial eligibility rules have had on persons with learning disabilities. Pl.'s Mem. Law Supp. Mot. to Amend at 2 (emphasis added).

Considering all the evidence in the light most favorable to Bowers, however, I find that this language is not conclusive and that Bowers has alleged intentional discrimination on the part of the NCAA. First, language also appears in Bowers's complaint which alleges intentional discrimination. For example, Bowers asserts that the NCAA, among other Defendants, has "systematically and intentionally discriminated against individuals with disabilities...." First Am. Compl. ¶ 183.

■■ More significantly, that Bowers has alleged a claim of intentional discrimination is evidenced by the type of policy that he has attacked. A disparate impact claim is one that challenges a facially neu-

tral policy because the burdens of that policy are borne disproportionately by a particular class of people. *See Mayberry v. Von Valtier,* 843 F.Supp. 1160, 1164–65 (E.D.Mich.1994); *Crowder v. Kitagawa,* 81 F.3d 1480, 1483 (9th Cir.1996) (stating the same in the context of an ADA claim). In this case, however, Bowers has not attacked a facially neutral policy. The Supreme Court, in its decision in *Alexander v. Choate,* 469 U.S. 287, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), offered guidance as to what constitutes a facially neutral policy. In that case, the plaintiffs charged that a regulation that would reduce the number of days of inpatient hospital care covered by Tennessee's Medicaid program amounted to discrimination against the disabled because the disabled require more inpatient hospital care than the non-disabled do. In holding that the case involved a disparate impact claim and that section 504 of the Rehabilitation Act applies to such claims, the Court described the policy at issue as "neutral" because "[t]he reduction ... [did] not distinguish between those whose coverage will be reduced and whose coverage will not on the basis of any test, judgment, or trait that the handicapped as a class are less capable of meeting or less likely of having." *Id.* at 302, 105 S.Ct. 712. In this case, the challenged policy states that "[c]ourses that are taught at a level below the high school's regular instructional level (e.g., remedial, special education or compensatory) shall not be considered core courses regardless of course content." Exhibits of Defs., Ex. 50 (NCAA Bylaw 14.3.1.3). This provision is not facially neutral precisely because it is premised on a "trait that the handicapped as a class are less capable of meeting or less likely of having," i.e., a specified level of academic

achievement. NCAA Bylaw 14.3.1.3.5, which enables students with learning disabilities to obtain core course credit for special education classes,[8] does not render the NCAA's policy neutral. The learning disabled still bear the burden of proving that their special education courses are "good enough" to satisfy the core course requirement. After all, "[t]he learning-disabled or handicapped student must still complete the required core courses and achieve the minimum required grade-point average in this core curriculum." Exhibits of Defs., Ex. 50 (NCAA Bylaw 14.3.1.3.5). At the very least, Bylaw 14.3.1.3, even when Bylaw 14.3.1.3.5 is considered, suggests that Bowers's contention that the NCAA "knowingly and intentionally" discriminated against him because of his learning disabled may have some merit, even if this evidence, standing alone, is far from convincing. Where a policy that is not facially neutral is the subject of a disability claim, it is appropriate to construe that claim to allege intentional discrimination. *See Alexander,* 469 U.S. at 302, 105 S.Ct. 712; *see also McKelvey v. Turnage,* 792 F.2d 194, 205 n. 3 (D.C.Cir. 1986) (Ginsburg, concurring in part and dissenting in part) (interpreting *Alexander* to mean that a regulation "that is not neutral on its face as between handicapped individuals and others would constitute intentional discrimination"). Accordingly, compensatory damages may be available to Bowers, provided, of course, that Bowers is able to demonstrate the intentional discrimination he alleges.

■ The NCAA also argues that it is entitled to summary judgment because even if the law permits damages to be awarded in this case, the NCAA did not

---

8. The NCAA Bylaws state, in pertinent part: The NCAA Academic Requirements Committee may approve the use of high-school courses for the learning disabled and handicapped to fulfill the core-curriculum requirements if the high-school principal submits a written statement to the NCAA indicating that students in such classes are expected to acquire the same knowledge, both quantitatively and qualitatively, as students in other core courses. The learning-disabled or handicapped student must still complete the required core courses and achieve the minimum required grade-point average in this core curriculum.
Exhibits of Defs., Ex. 50 (NCAA Bylaw 14.3.1.3.5).

cause Bowers's damages. The NCAA argues it did not cause any damage to Bowers because Bowers would not have received a football scholarship, regardless of his eligibility status, due to his insufficient skills as a football player. NCAA Mem. Supp. Summ. J. at 51–53. As the discussion below addressing Bowers's Title II claim under the ADA indicates, I have determined there still exists a genuine question of material fact regarding when and why football programs eliminated Bowers as a potential recruit. *See infra* p. 511. The NCAA's argument that it is not liable for any damage Bowers suffered is directly linked to the remaining factual issue as to when and why institutions lost interest in Bowers as a football player. Summary judgment is not appropriate where genuine disputes of material fact still exist. Therefore, the NCAA is not entitled to summary judgment that it was not the cause of any damage Bowers suffered.

The NCAA also argues that it is entitled to summary judgment that Bowers may not seek damages based on the alleged loss of a future professional athletic career. NCAA Mem. Supp. Summ. J. at 54. The NCAA argues that such damages are speculative and not recoverable by law. While Bowers argues that a court must allow the issue of damages to move forward even if the amount of damages is imprecise, that is not the issue presented here. Pl.'s Resp. to Mots. Summ. J. at 50. The issue is not the amount of damages, but whether such damages would ever be sustained by Bowers.

The NCAA cites cases where individuals were found not to possess property interests in the possibility of a future professional athletic career as supportive of its position. *See, e.g., Justice v. National Collegiate Athletic Ass'n,* 577 F.Supp. 356 (D.Ariz.1983)(explaining that the court "flatly rejects" assertion of college football players that they held a property interest in receiving television exposure in order to compete for professional contracts); *Colorado Seminary v. National Collegiate Athletic Ass'n,* 417 F.Supp. 885 (D.Colo.1976)(determining that "the interest in future professional careers must nevertheless be considered speculative and not of constitutional dimensions."); *Hawkins v. National Collegiate Athletic Ass'n,* 652 F.Supp. 602 (D.Ill.1987)(stating that the Constitution does not protect the right to secure a professional career in athletics); *Knapp v. Northwestern Univ.,* No. 95 C 6454, 1996 WL 495559 (N.D.Ill. August 28, 1996)(describing that "the possibility of obtaining [a] professional basketball career is too speculative" to establish an economic interest that the court could act to protect.) Bowers argues that these cases are not dispositive because they concern property interests and that he is not required to establish a property interest under any of his claims. Pl's Resp. to Mots. Summ. J. at 50 n.3. While Bowers is correct in that he is not required to establish a property interest under the claims he has asserted, I find the cases relied upon by the NCAA to be persuasive because they recognize and emphasize the speculative nature of the claim that a student-athlete has lost a potential future professional athletic career.

I agree that damages for the loss of a potential future professional athletic career are speculative because the possibility that such damages would ever occur is too conjectural for determination.[9] Many contingencies must occur before Bowers could enjoy a professional athletic career. Those contingencies include, but are not limited to, whether Bowers would escape injury, whether Bowers would excel at college football and whether any professional team would show an interest in Bowers. In short, the road to a professional football

9. Indeed, in support of its argument, the NCAA cites Congressional testimony that of the approximately 41,000 college football players each year (approximately 12,000 of which play for Division I–A teams), approximately 150 will play for National Football League teams. NCAA Mem. Supp. Summ. J. at 54.

career is long and circuitous, and Bowers has not gone down that road far enough to submit such a fanciful damage claim to a fact finder. Accordingly, Bowers may not pursue damages for the loss of a potential professional athletic career.

## II. DISCUSSION

### A. Legal Standard for Summary Judgment

"On a motion for summary judgment, the court must determine whether the evidence shows that 'there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.'" *Abraham v. Raso*, 183 F.3d 279, 287 (3d Cir.1999) (citing Fed.R.Civ.P. 56(c)). "Any factual dispute invoked by the nonmoving party to resist summary judgment must be both material in the sense of bearing on an essential element of the plaintiff's claim and genuine in the sense that a reasonable jury could find in favor of the nonmoving party." *Id.* (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248–251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In opposing summary judgment, a party "must do more than simply show that there is some metaphysical doubt as to material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986), but a court should not prevent a case from reaching a jury simply because the court favors one of several reasonable views of the evidence. *Abraham*, 183 F.3d at 287. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505; *see also Abraham*, 183 F.3d at 287. "Thus, while the nonmoving party must present enough evidence to demonstrate a dispute is genuine, all inferences in interpreting the evidence presented by the parties should be drawn in favor of the nonmoving party." *Abraham*, 183 F.3d at 287 (citing *Boyle v. County of Allegheny Pa.*, 139 F.3d 386, 393 (3d Cir.1998)). "Cases

that turn crucially on the credibility of witnesses' testimony in particular should not be resolved on summary judgment." *Id.*

If the nonmoving party fails to oppose the motion by written objection, memorandum, affidavits and other evidence, the Court "will accept as true all material facts set forth by the moving party with appropriate record support." *Anchorage Assocs. v. Virgin Islands Bd. of Tax Rev.*, 922 F.2d 168, 175 (3d Cir.1990) (quoting *Jaroma v. Massey*, 873 F.2d 17, 21 (1st Cir.1989)). Even where the non-moving party has failed to establish a triable issue of fact, summary judgment will not be granted unless "appropriate." Fed. R.Civ.P. 56(e); *see Anchorage Assocs.*, 922 F.2d at 175. Rule 56(e) of the Federal Rules of Civil Procedure requires that the case be evaluated on its merits, with summary judgment being granted for the movants only if they are entitled to a judgment as a matter of law. *See Anchorage Assocs.*, 922 F.2d at 175.

### B. ADA Claims

Temple, Iowa, the NCAA and AIC all move for summary judgment on Bowers's claims brought under the Americans with Disabilities Act ("ADA"). Bowers has brought suit under two basic provisions of the ADA. The first is section 12132, or Title II, of the ADA, which states:

> Subject to the provisions of this subchapter [42 U.S.C. §§ 12131–12165], no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity.

42 U.S.C. § 12132. I have previously explained that this provision applies to Bowers's ADA claim against Iowa and Temple and not to his ADA claim against the NCAA and AIC. *Bowers II*, 9 F.Supp.2d at 474.

The second provision of the ADA under which Bowers sues is section 12182(a), or Title III, which applies to Bowers's claims against the NCAA and AIC. This section provides as a general rule that:

No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

### 1. *Title II Claims against Temple and Iowa*

 To succeed on his claim under Title II, Bowers must prove that: (1) he is a qualified individual; (2) with a disability; (3) he was excluded from participation in or denied the benefits of the services, programs, or activities of a public entity, or was subjected to discrimination by any such entity; (4) by reason of his disability.

Both Temple and Iowa argue they are entitled to summary judgment on Bowers's Title II claim because Bowers can not prove he is a "qualified individual," as required by Title II, and because Bowers can not prove he was denied eligibility status "by reason of" any disability.[10] Temple Mem. Supp. Summ. J. at 13, 18; Iowa Mem. Supp. Summ. J. at 6.

The ADA defines "qualified individual with a disability," in relevant part, as:

an individual with a disability who, with or without reasonable modifications to rules, policies, or practices ... or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2). Because neither Temple nor Iowa challenges whether Bowers is "disabled" as defined under the ADA, I must determine whether Temple and Iowa are entitled to summary judgment on the question of whether Bowers is a "qualified individual" who was discriminated against "by reason of" his disability.

 An individual is a "qualified individual" if that individual can meet essential requirements with or without reasonable modification. *Pottgen v. Missouri State High Sch. Activities Ass'n*, 40 F.3d 926, 930–31 (8th Cir.1994). Therefore, I will apply two criteria to determine whether Bowers is a "qualified individual": (1) whether the eligibility requirements imposed upon Bowers are essential; and (2) if so, whether Bowers meets these requirements with or without a modification. *See, e.g., Gaul v. Lucent Technologies, Inc.*, 134 F.3d 576, 580 (3d Cir.1998);[11] *Pottgen*, 40 F.3d at 930.

 Additionally, under Title II a plaintiff must establish a causal connection between his or her disability and the alleged discrimination to satisfy Title II's "by reason of" requirement. *Sandison v.*

10. Neither Temple nor Iowa has yet sought summary judgment on the ground that they are immune from Bowers's suit under the doctrine of sovereign immunity embodied in the Eleventh Amendment. Therefore, this issue is not currently before me. I acknowledge, however, the Third Circuit's recent opinion in *Lavia v. Pennsylvania Department of Corrections*, 224 F.3d 190 (3d Cir.2000), which held that Congress's abrogation of the states' sovereign immunity under Title I of the ADA was not constitutionally proper. The Third Circuit stated in *Lavia* that it did not address Title II in its analysis. 224 F.3d at 194 n. 1. The Third Circuit also noted in *Lavia* that the Supreme Court has granted certiorari in *University of Alabama at Birmingham Board of Trustees v. Garrett*, —— U.S. ——, 120 S.Ct. 1669, 146 L.Ed.2d 479 (2000), where the Court will address the validity of the abrogation of the states' sovereign immunity under Titles I and II of the ADA. *Id.* at n. 2. The eventual resolution of this issue by the Supreme Court will determine whether Bowers's claims against Temple and Iowa may proceed in this Court.

11. While Title I was at issue in *Gaul*, Title I also requires an analysis of whether an individual is "otherwise qualified," but in the employment context. *See* 42 U.S.C. § 12112.

*Michigan High Sch. Athletic Ass'n., Inc.*, 64 F.3d 1026, 1036 (6th Cir.1995); *Rhodes v. Ohio High Sch. Athletic Ass'n.*, 939 F.Supp. 584, 592 (N.D.Ohio 1996). If a plaintiff was excluded for a legitimate reason other than because of a disability, then that action does not violate the principles of the ADA. *Southeastern Community College v. Davis*, 442 U.S. 397, 410, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979)(explaining that purpose is to "eliminate discrimination against otherwise qualified individuals").[12] The Supreme Court has described the "by reason of" and "otherwise qualified" prongs as two sides of the same coin, *Alexander v. Choate*, 469 U.S. 287, 299 n. 19, 105 S.Ct. 712, 83 L.Ed.2d 661 (1985), and the two requirements are usually discussed in tandem, as I will below.

■ Temple and Iowa claim that Bowers is not a "qualified individual," as required by Title II, because he could not meet the essential requirements of the offensive lineman position on their respective football teams with or without accommodation.[13] Temple and Iowa assert that the offensive lineman position requires a combination of bulk weight, superior strength and superior skill to repel and tackle the large defensive linemen prevalent in Division I football.[14] Temple Mem. Supp. Summ. J. at 19; Iowa Mem. Supp. Summ. J. at 7. Both Temple and Iowa argue that by his senior year of high school, Bowers had not developed the requisite skill or body mass to be qualified for an offensive lineman position. Temple Mem. Supp. Summ. J. at 19; Iowa Mem. Supp. Summ. J. at 7.

Therefore, Temple and Iowa argue that Bowers is not a "qualified individual" be- cause he lacked the essential features and skill necessary to perform the duties of an offensive lineman, regardless of any learning disability. Temple and Iowa claim that even if Bowers met the core course requirement, he would not have been recruited to play on either university's football team. Temple Mem. Supp. Sum. J. at 16, 19; Iowa Mem. Supp. Summ. J. at 7–8. Therefore, Temple and Iowa argue that Bowers, at best, was the victim of the application of a non-discriminatory qualification (weight and skill), and was not excluded "because of" his disability.

Bowers, however, argues that he possessed the necessary skills for an offensive lineman position and that Temple and Iowa ceased their recruiting efforts because he was denied eligibility due to his learning disability. Pl.'s Resp. to Mots. Summ. J. at 32. Bowers argues that both Temple and Iowa showed great interest in him as a future football player until they learned he would not receive eligibility certification from the NCAA. *Id.*

In *Bowers II*, I determined that there were "substantial questions of fact" regarding both the "qualified individual" and "by reason of" prongs regarding the Title II claim against Temple and Iowa which precluded the entry of summary judgment at that time. *Bowers II*, 9 F.Supp.2d at 478. I observed there that there was a genuine issue of material fact regarding "when and why Bowers was eliminated as a potential football recruit." *Id.* I now must determine whether, based on the discovery that has occurred since my *Bowers II* decision, such questions of fact still exist.

Bowers was not discriminated against because of his disability, but because his academic record could not support a finding of eligibility, regardless of disability. Therefore, I will only address that argument in the context of the NCAA's motion.

---

12. While the Supreme Court in *Davis* considered the "solely by reason of" language of the Rehabilitation Act, courts have recognized the applicability of the interpretation of similar Rehabilitation Act language in ADA cases. *See, e.g., Sandison*, 64 F.3d at 1036; *Rhodes*, 939 F.Supp. at 592.

13. It is unclear from Iowa's and Temple's briefs whether they also join the NCAA's arguments, presented under Title III analysis, that

14. Bowers does not challenge that the described attributes are essential requirements of an offensive lineman position.

A review of the summary judgment record before me reveals that there are still unresolved material issues of fact regarding whether Bowers was a "qualified individual" based on his physical attributes and football skills and whether Temple and Iowa did not recruit Bowers "because of" his learning disability. I may not weigh the credibility of evidence in a summary judgment motion where the factual issues may be reasonably resolved in favor of either party. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Abraham v. Raso,* 183 F.3d 279, 287 (3d Cir.1999). It is up to a fact finder to weigh the conflicting testimony presented by Temple, Iowa and Bowers regarding when and why Bowers was eliminated as a potential recruit.

Perhaps the most essential remaining factual dispute between the parties encompasses Temple's and Iowa's proffered reason why they discontinued their recruiting efforts. While both Temple and Iowa claim they stopped recruiting Bowers because of his size and skill development by his senior year of high school, Bowers points to evidence in the summary judgment record that his senior year scouting reports described him as of "excellent size" and "very strong." Exhibits of Pl., Ex. 36 ("McCarthy Report"); *Id.,* Ex. 35 ("Lemming Report"). The "Lemming Report" also states that "scouts love [Bowers's] size and potential." Bowers also claims that Iowa Coach Frank Verducci ("Verducci")knew Bowers was keeping his weight down because he also participated in high school wrestling, and that his weight in his senior year was of "no surprise to Verducci." Pl.'s Rule 56.1 Stmt. ¶ 224; Exhibits of Pl., Ex. 25, at 84–86 (Verducci Dep.). In fact, Bowers cites to Verducci's testimony that he told Bowers he could expect to put on weight during his freshman year of college. *Id.* at 158–59 (Verducci Dep.).

There is also some dispute as to the atmosphere, or tone, of the recruitment efforts Bowers's experienced. Bowers alleges that he was the subject of much more aggressive recruitment by Temple and Iowa than that claimed by Temple and Iowa. For example, Bowers claims that Verducci's testimony reveals that he was contacted very early by Iowa, which was abnormal, and that he was "heavily recruited" by Iowa, including a face to face visit with Verducci that broke the NCAA's recruiting rules. *Id.* at 102–03, 121–24, 139, 153. Iowa alleges, however, that the record reveals it engages in an early recruiting push with many potential recruits and that Bowers was no more heavily recruited than many candidates who were thereafter dropped from the list of recruits. *See* Exhibits of Defs., Ex. 25 at 108–111 (Verducci Dep.).

There is also a factual dispute as to whether, on August 15, 1995, Bowers was offered a football scholarship to attend Iowa. *See* Pl.'s Rule 56.1 Stmt. ¶ 226; Exhibits of Pl., Ex. 4 at 132, 136 (Bowers Dep.). Iowa denies ever making such an offer. *See* Exhibits of Defs., Ex. 25 at 191 (Verducci Dep.). Regarding Temple, there is also a dispute of material fact as to whether Bowers remained on Temple's Coach Christopher Roulhac III's ("Roulhac") short list of players to recruit created in May of 1995. Bowers claims that Roulhac still contacted him after that date. Pl.'s Rule 56.1 Stmt. ¶¶ 264–265. Temple alleges Roulhac did not include Bowers on that short list. Temple's 56.1 Stmt. ¶ 31; Exhibits of Defs., Ex. 19 at 131 (Roulhac Dep.).

There is also a dispute regarding the motivation behind a statement by Verducci to Bowers in which he allegedly revealed to Bowers that Iowa would no longer recruit him because of his academic record and that Bowers's learning disability was affecting his recruitment. Bowers contends that this statement reveals the truth. Exhibits of Pl., Ex. 90 at ¶ 18 (Defendant's Answers to First Set of Amended Interrogatories); Ex. 25 at 141–42, 191 (Verducci Dep.). Verducci, however, testified that he mentioned academics to Bowers only to let him down easy, and not because that

was the true reason behind his termination as a recruit. Exhibits of Pl., Ex. 25 at 141–42 (Verducci Dep.).

Because there are factual issues here that may be reasonably resolved in favor of either party, it is up to a fact finder to weigh the evidence surrounding Temple's and Iowa's evaluations of Bowers's skills and strengths as a football player. The disputes of material fact regarding when and why Bowers was dropped as a potential recruit preclude me from granting Temple's or Iowa's motion for summary judgment on Bowers's claims against them under Title II of the ADA.

### 2. Title III Claims against the NCAA and AIC

In order to succeed under Title III of the ADA, Bowers must prove that: (1) he was discriminated against on the basis of disability; (2) in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation; (3) by any person who owns, leases (or leases to), or operates a place of public accommodation. *See, e.g., Shultz By and Through Shultz v. Hemet Youth Pony League,* 943 F.Supp. 1222, 1225 (C.D.Cal.1996); *Sharrow v. Bailey,* 910 F.Supp. 187 (M.D.Pa. 1995); *Howe v. Hull,* 873 F.Supp. 72, 78 (N.D.Ohio 1994); *see also Fink v. Kitzman,* 881 F.Supp. 1347, 1373–74 (N.D.Iowa 1995) (discussing prima facie case under ADA).

Both the NCAA and AIC [15] argue they are entitled to judgment as a matter of law on Bowers's Title III claim because Bowers was not "discriminated against on the basis of disability". The NCAA argues it is also entitled to summary judgment because it is not an "operator" of a place of public accommodation.

#### a. "By any person who owns, leases (or leases to), or operates a place of public accommodation"

The relevant language of Title III instructs that for its protections to apply, any alleged discrimination must be committed by a "person who owns, leases (or leases to), or operates a place of public accommodation". 42 U.S.C. § 12182. The NCAA claims that the protections of Title III can not be applicable here because it is not an owner, lessor, or operator of a place of public accommodation. NCAA Mem. Supp. Summ. J. at 43. Because this is an essential prong of the Title III prima facie case analysis, the NCAA argues it is entitled to summary judgment on Bowers's Title III claim because it is not the owner, lessor or operator of a place of public accommodation under Title III.

Bowers, however, contends that the NCAA is not entitled to judgment as a matter of law that it is not the owner, lessor or operator of a place of public accommodation. While Bowers does not appear to raise any factual dispute regarding this issue, he argues that the NCAA's control over its member institutions is sufficient to establish that the NCAA is an operator of a public accommodation under Title III. Pl.'s Resp. to Mots. Summ. J. at 8–13.

In *Bowers II,* I denied the NCAA's motion for summary judgment on this same issue based on the record as it then existed before me. In *Bowers II,* I determined that the NCAA itself is not a place of public accommodation in that it is not a physical place. 9 F.Supp.2d at 483 (citing *Ford v. Schering–Plough Corp.,* 145 F.3d 601 (3d Cir.1998)). Therefore, I explained that the crucial issue is whether the NCAA

---

**15.** AIC states in its brief that it joins the NCAA's brief regarding Bowers's ADA claim. AIC Mem. Supp. Summ. J. at 15. AIC also states in its brief that Bowers's lawsuit is "frivolous as to AIC" because Bowers never held any interest in actually attending AIC. *Id.* at 6. Temple makes a similar argument.

Temple Mem. Supp. Summ. J. at 20. That contention, however, does not resolve the issue of whether AIC violated Title III or whether Temple violated Title II. At most, AIC and Temple present another issue for determination by a fact finder.

owns, leases (or leases to) or operates a place of public accommodation. *Id.* at 484.

I also explained that while "operate" is not explicitly defined in the statutory framework of the ADA, the NCAA could "operate" under Title III if it "manages, controls or regulates the place or places of public accommodation of which Bowers was allegedly denied enjoyment in such a way that the NCAA manages, controls or regulates the allegedly discriminatory conditions of that place or those places of public accommodation." *Id.* at 486.

I applied this definition of "operate" to the record that existed before me in *Bowers II.* I denied the NCAA's motion for summary judgment on this issue, because I determined that "indeed it is quite possible for the NCAA to operate places of public accommodation in connection with the discriminatory conditions alleged by Bowers." *Id.* at 488–89. I found that it would have been impossible for me to conclude, based on the record then before me, that the NCAA did not exercise the requisite control over its members so as to avoid classification as an "operator" under Title III. *Id.* at 489.

In support of that conclusion, I cited evidence that the NCAA requires its member institutions "to control their athletic programs in 'compliance with the rules and regulations of the Association,'" including rules governing how institutions are to control themselves and an established procedure "for the investigation and punishment of violations of its rules, compliance with which is phrased in mandatory terms." *Id.* (quoting NCAA Manual § 2.1.1). Therefore, I concluded that "the NCAA's initial eligibility requirements determine whether and to what extent a particular student can participate in intercollegiate athletics and can receive institutional financial aid" and that "participation in intercollegiate athletics and receipt of financial aid from a member-institution are really just shorthand for a set of goods, services, facilities, privileges, advantages

or accommodation of specific places of public accommodation...." *Id.*

My denial of summary judgment afforded the NCAA and Bowers the opportunity to develop the record regarding to what extent the NCAA "controls" its member institutions in the context of whether it operates a place of public accommodation.

The NCAA, however, has not directed me to any new facts or legal arguments other than those I previously considered in *Bowers II.* Therefore, I must conclude, as I did in my previous opinion, that it is impossible for me to conclude, as a matter of law, that the NCAA does not operate a place of public accommodation, as required under Title III. Therefore, the NCAA's motion for summary judgment may not be granted on these grounds.

Additionally, because it appears that the record regarding this issue has not changed significantly since my *Bowers II* decision and that there are no disputes of material fact remaining, I will now hold, as a matter or law, that the NCAA is an operator of a place of public accommodation under Title III.

Several other courts have considered whether the NCAA "operates" a place of public accommodation under Title III. *See Butler v. National Collegiate Athletic Ass'n,* No. C96–1656L, 1996 WL 1058233 (W.D.Wash. Nov.8, 1996); *Ganden v. National Collegiate Athletic Ass'n,* No. 96 C 6953, 1996 WL 680000 (N.D.Ill. Nov.21, 1996); *Tatum v. National Collegiate Athletic Ass'n,* 992 F.Supp. 1114 (E.D.Mo. 1998); *Matthews v. National Collegiate Athletic Ass'n,* 79 F.Supp.2d 1199 (E.D.Wash.1999). Of those courts which have considered the issue, only one, the United States District Court for the Eastern District of Washington, in *Matthews,* concluded that the NCAA is not an operator of a place of public accommodation under Title III.

In *Butler v. National Collegiate Athletic Ass'n,* a plaintiff with a learning disability sought a preliminary injunction against the

NCAA, claiming that he was denied academic eligibility to play Division I football in violation of the ADA. 1996 WL 1058233 at *1. The NCAA challenged the request, arguing, *inter alia*, that it does not operate a place of public accommodation. *Id.* at *2–*3. The District Court for the Western District of Washington granted a preliminary injunction to the plaintiff and denied the NCAA's motion to dismiss. *Id.* at *6. In denying the NCAA's motion to dismiss, the court stated its denial would allow the plaintiff to develop the factual record regarding whether the NCAA operated the university facilities implicated in the plaintiff's lawsuit. *Id.* at *5. The court left open the possibility that the NCAA could be an operator under Title III, as long as the record revealed evidence of the requisite control. While the *Butler* court stated that there were still factual issues present that precluded the entry of judgment as a matter of law, that is not the case here. *Id.* at *5.

*Ganden* also involved a claim by a learning disabled plaintiff that the NCAA's initial eligibility procedure violated the ADA. The court there, with a request for a preliminary injunction before it, found that there was a reasonable likelihood that the plaintiff could show that the NCAA operates a place of public accommodation. 1996 WL 680000 at *11. Again, however, the court left open for discovery the exact nature of the NCAA's control over any place of public accommodation. *Id.*

The issue in *Tatum* was whether the court should issue a preliminary injunction in favor of a plaintiff who alleged that the NCAA's failure to accept his untimed ACT score violated the ADA. In considering whether the NCAA operated a place of public accommodation under Title III, the court cited to provisions of the NCAA's bylaws as evidence of the NCAA's control over the facilities of its member institu-

tions. 992 F.Supp. at 1120. For example, the court noted how the NCAA regulated the number of days a student-athlete could practice in training facilities, controlled what type of equipment could be used, regulated under what conditions the outside public could use training facilities and controlled other aspects of use of athletic facilities. *Id.* Based on that evidence, the court determined that the NCAA is an operator of a place of public accommodation based on "the significant degree of control that the NCAA exerts over the athletic facilities of its member institutions." *Id.* at 1121.

Chief Judge Nielsen of the Eastern District of Washington disagreed with *Tatum* in *Matthews*, where a learning disabled student challenged the NCAA's in-college minimum course load requirements. Chief Judge Nielsen did not find that the plaintiff in *Matthews* had shown such allegations of control to be correct. 79 F.Supp.2d at 1205. The court determined that the evidence before it showed the NCAA has "no direct control over any of the facilities used by member institutions." *Id.* at 1206. Because there was no evidence of control over facilities before the court, the court determined that the NCAA "regulates only the eligibility and membership criteria of its member institutions and their student-athletes." *Id.*

I respectfully disagree with the court's decision in *Matthews*. As in *Tatum*, there is sufficient unchallenged evidence before me that the NCAA does more than merely regulate the eligibility of potential college athletes. The NCAA manages and controls places of public accommodation in many senses, including who participates in interscholastic athletic competitions that occur in places of public accommodation, the facilities of its member schools,[16] via various eligibility requirements.[17] Also, as

---

**16.** Indeed, the NCAA does not argue that the athletic facilities of its member schools are not "places of public accommodation" under Title III.

**17.** The Ninth Circuit described this conclusion by noting that Title III "applies to the playing field." *Martin v. PGA Tour, Inc.,* 204 F.3d 994, 998 (9th Cir.2000), *cert. granted,* —

I explained in *Bowers II,* the NCAA's own bylaws demand that "[i]t is the responsibility of each member-institution to control its intercollegiate athletics program in compliance with the rules and regulations of the Association." 9 F.Supp.2d at 488 (citing NCAA Manual at § 2.1.1). It logically follows that control over an athletic program necessarily includes control over athletic facilities. Therefore, the NCAA is effectively determining the rules and regulations of each member's athletic facilities.

In *Bowers II,* I explained how "the NCAA governs in a relatively detailed fashion exactly how institutions are to control themselves" and that the NCAA provides "for an intricate procedure for the investigation and punishment of violations of its rules." 9 F.Supp.2d at 489 (citing NCAA Manual at §§ 6, 2.7.1). The record has now been fully developed in this case, and the NCAA has not presented me with any evidence to suggest its "control" does not exist such that the NCAA may not be considered an operator of a place of public accommodation. Accordingly, I hold, as a matter of law, that the NCAA is an operator of a place of public accommodation.

### b. "Discriminated against on the basis of disability"

Under Title III of the ADA, the relevant definition of "Discrimination" encompasses two concepts. Discrimination includes:

The imposition or application of eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any goods, services, facilities, privileges, advantages, or accommodations, unless such criteria can be shown to be necessary for the provision of the goods, ser-

vices, facilities, privileges advantages, or accommodation being offered.

42 U.S.C. § 12182(b)(2)(A)(i). "Discrimination" also includes:

a failure to make reasonable modifications in policies, practices or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations.

42 U.S.C. § 12182(b)(2)(A)(ii).

The inquiry under Title III as to whether an individual was "discriminated against on the basis of disability" is analogous to the "otherwise qualified" and "by reason of" analysis that is applied to a Title II claim.[18] *Ganden,* 1996 WL 680000 at *14. Thus, a plaintiff seeking relief under Title III must also make a causal connection between the alleged discrimination and the individual's disability. To establish that link, a Title III plaintiff may show the existence of unnecessary eligibility criteria that "screen out or tend to screen out" individuals with a disability. 42 U.S.C. § 12182(b)(2)(A)(i). Also, proof of a failure to provide reasonable accommodations that do not fundamentally alter may support a claim under Title III. 42 U.S.C. § 12182(b)(2)(A)(ii).

The NCAA argues that Bowers cannot sustain a claim under Title III because Bowers can not provide a causal link, in other words, that he can not prove he would have been qualified to participate in intercollegiate sports "but for" any alleged discrimination. NCAA Mem. Supp.

U.S. ——, 121 S.Ct. 30, 147 L.Ed.2d 1052 (2000).

**18.** While the words "otherwise qualified" or "qualified individual" do not appear in the language of Title III, Title II analysis can be applicable to Title III claims. *See, e.g., Bercovitch v. Baldwin Sch., Inc.,* 133 F.3d 141,

154 (1st Cir.1998). The use of the exact words "otherwise qualified" would not make sense in the accommodation context of Title III. Also, the presence of the "fundamentally alter" concept in Title III suggests that the "otherwise qualified" reasoning of Title II applies, despite the absence of exactly similar language.

Summ. J. at 23. The NCAA further contends that its eligibility requirements are necessary such that even if they "screen out" or "tend to screen out" persons with disabilities, they are necessary or essential to maintain its purpose as a gatekeeper to intercollegiate athletics. NCAA Mem. Supp. Summ. J. at 27–28. Additionally, the NCAA maintains that Bowers has not established the existence of any reasonable modification that would not fundamentally alter the purposes of the NCAA that would render Bowers eligible to engage in intercollegiate athletics. NCAA Mem. Supp. Summ. J. at 25–26. Finally, the NCAA argues that any reasonable modification that would not fundamentally alter has already been afforded to Bowers. NCAA Mem. Supp. Summ. J. at 31.

Bowers challenges the NCAA's assertion that it is entitled to summary judgment. Bowers claims that he can establish a causal link. Bowers also asserts that the NCAA's eligibility criteria are not essential, and that there are reasonable modifications available which would make Bowers eligible for participation in intercollegiate sport that would not fundamentally alter the NCAA's eligibility requirements. Pl.'s Resp. to Mots. Summ. J. at 33–36.

 In *Bowers II*, I denied the NCAA's motion for summary judgment on Bowers's Title III claim due to the need to conduct further discovery regarding the following: (1) whether the eligibility requirements actually "screen out" or "tend to screen out" individuals with disabilities due to the existence of the waiver procedure and the principal's certification alternative; (2) whether the eligibility requirements are "necessary" and if Bowers could meet those requirements with or without modification; and (3) whether Bowers proposed relief would fundamentally alter the nature of the NCAA's activities. *Bowers II*, 9 F.Supp.2d at 476–78, 490. I must now determine whether, after further discovery, any material disputes of fact exist

and whether the NCAA is entitled to judgment as a matter of law.

### i. Eligibility Criteria

 Eligibility criteria that "screen out" or "tend to screen out" disabled individuals violate the ADA unless the proponent of the eligibility criteria can show that the eligibility requirements are necessary. 42 U.S.C. § 12182(b)(2)(A)(i); *Guckenberger v. Boston Univ.*, 974 F.Supp. 106, 134 (D.Mass.1997). The "screen out" concept "makes it discriminatory to impose policies or criteria that, while not creating a direct bar to individuals with disabilities, diminish an individual's chances of such participation." *Guckenberger*, 974 F.Supp. at 134 (quoting *Doukas v. Metropolitan Life Ins. Co.*, 950 F.Supp. 422, 426 (D.N.H. 1996)).

The NCAA has not directly addressed the "screen out" issue in its briefs supporting its motion for summary judgment. The burden of establishing whether an eligibility requirement screens out or tends to screen out individuals with disabilities must be borne by the plaintiff. On a motion for summary judgment, however, it is the burden of the moving party to establish that the moving party is entitled to judgment as a matter of law. Although the NCAA does present an argument that its eligibility requirements are necessary, which I will discuss below, its failure to demonstrate that the core course requirement does not screen out disabled individuals forecloses this court from granting summary judgment to the NCAA on the issue of whether the NCAA's eligibility criteria "screen out" or "tend to screen out" individuals with disabilities.

The NCAA does argue that its core course eligibility requirement is necessary. In the employment context, a job function is essential if "the reason the position exists is to perform that particular function." *Van de Pol v. Caesars Hotel Casino*, 979 F.Supp. 308, 314 (D.N.J.1997)(quoting *Smith v. Blue Cross Blue Shield of Kansas*, 894 F.Supp. 1463, 1468 (D.Kan.1995)).

Therefore, in the employment context, a court would examine the purpose of the position at issue and whether the plaintiff could perform that function. In the Title III context, courts have deemed essential age limit and semester participation limits of high school athletic associations. *See, e.g., McPherson v. Michigan High Sch. Athletic Ass'n, Inc.,* 119 F.3d 453 (6th Cir.1997)(determining eight semester cap is essential based on its purpose to create a level playing field); *Pottgen v. Missouri State High Sch. Activities Ass'n,* 40 F.3d 926 (8th Cir.1994)(determining age limit on participation in high school athletics is essential to reduce unfair competitive advantage).

The NCAA argues that its core course eligibility requirement is essential to the NCAA's mission of governing intercollegiate athletics in a manner that ensures student-athletes will succeed academically in their freshman year, despite the athletic pressures of intercollegiate competition. NCAA Mem. Supp. Summ. J. at 28. Again, however, the NCAA has not carried its burden here to show that it is entitled to judgment as a matter of law by demonstrating that its treatment of special education courses under the core course requirement is essential or necessary to that goal. The NCAA has not directed me to any new evidence which would lead to the conclusion that the core course requirement is essential. Bowers, on the other hand, has brought research to my attention that supports the argument that the core course requirement, as it relates to learning disabled students, does not promote the NCAA's stated goal of ensuring successful academic performance. Pl.'s Rule 56.1 Stmt. ¶¶ 59–99.[19] Therefore, the NCAA is not entitled to summary judgment that its core course requirements are essential. It is still an open question whether Bowers was discriminated against by the implementation of unnecessary eligibility criteria that screen out individuals with disabilities.

### ii. Reasonable Modification/Fundamentally Alter

Under Title III, the core course requirement may also be found to discriminate if Bowers could meet the NCAA's eligibility requirements with the implementation of a reasonable modification and the NCAA has refused to implement such a modification. *Easley v. Snider,* 36 F.3d 297, 302 (3d Cir.1994); *Van de Pol v. Caesars Hotel Casino,* 979 F.Supp. at 313. It is a plaintiff's burden to establish that such a reasonable modification exists. *Walton v. Mental Health Ass'n. of Southeastern Pa.,* 168 F.3d 661, 670 (3d Cir.1999). If such a reasonable modification exists, a defendant has the opportunity to show that that modification would fundamentally alter the requirement at issue. *Id.* If a defendant is successful in proving that fundamental alteration would take place, then the ADA does not demand implementation of that modification. *Id.*

Bowers argues that there exists a reasonable modification that would have allowed him to qualify for participation in intercollegiate athletics. Bowers proposes in his First Amended Complaint that if the NCAA would have accepted as core courses his special education courses which contained 75 percent of the content of a "regular" course, he would have received a scholarship and played Division I football. First Am. Compl. at 24. Bowers asserts that his 75 percent rule would be a reasonable modification that would not fundamentally alter the NCAA's eligibility program.

---

19. The NCAA does make the argument that the existence of a waiver procedure does not necessarily render an eligibility requirement unnecessary. NCAA Mem. Supp. Summ. J. at 29. While that may be true, that argument is not specific enough to warrant summary judgment that the eligibility requirements at issue here are necessary. The NCAA also argues that the eligibility requirements are necessary as a check against untruthful submissions by high schools or students. *Id.* at 30. Again, however, this argument is not detailed enough to prove these exact criteria are necessary to serve that purpose.

The NCAA argues, however, that Bowers's proposed 75 percent rule is not a reasonable modification and that it would fundamentally alter the goal of the eligibility program. NCAA Mem. Supp. Summ. J. at 26. The NCAA believes that Bowers's proposed modification would fundamentally alter its eligibility program because it considers its eligibility standards essential. *Id.* at 27. The NCAA argues that Bowers's proposed modification would force the NCAA to lower the bar, or to diminish the strength, of an essential standard it employs to fulfill its goal of promoting academic success for student-athletes. *Id.* at 32.

In *Bowers II*, I explained that there were issues of material fact remaining that precluded summary judgment at that time on the issue of whether Bowers's proposed 75 percent modification would fundamentally alter the NCAA's eligibility program, including whether the core course requirement is necessary to the NCAA's program, such that modification of the program akin to what Bowers requests would fundamentally alter the goals of the program. 9 F.Supp.2d at 478.

As I explained above, the NCAA has not carried its summary judgment burden and presented to this Court a fully developed record regarding whether the core course requirement is essential or necessary. Therefore, without being able reach a conclusion regarding a prong of the "fundamentally alter" analysis, I can not determine that the NCAA is entitled to a judgment, as a matter of law, that Bowers's proposed modification would fundamentally alter the NCAA's eligibility program.

In addition to arguing that the ADA does not require it to implement Bowers's proposed modification, the NCAA also argues that it has already afforded a reasonable modification to Bowers. NCAA Mem. Supp. Summ. J. at 10. Specifically, the NCAA points out that Bowers was afforded a waiver procedure consistent with the Consent Decree entered between the NCAA and the United States Department of Justice in May 1998 regarding the NCAA's evaluation of special education courses under the core course requirement.[20] NCAA Mem. Supp. Summ. J. at 10–11. Under this waiver procedure, the NCAA argues it performed a substantive analysis of each special education course Bowers completed. *Id.* at 11. The NCAA argues the review was performed by individuals with "considerable expertise in the field of learning disabilities." *Id.* at 12. The NCAA reports that, as a result of this waiver procedure, it did accept some of Bowers's special education courses as core courses, but not all, and that the committee assigned to evaluate Bowers's courses denied Bowers's request for a waiver by a unanimous vote. *Id.* at 15. Therefore, the NCAA concludes that Bowers received a reasonable modification in the form of the waiver procedure and that the modification did not render him qualified.

In response, Bowers argues that the waiver procedure afforded to him was, in fact, not a "reasonable" modification because the waiver process is ineffective and does not alleviate the discriminatory exclusion of learning disabled individuals from receiving qualifier status. Pl.'s Resp. to Mots. Summ. J. at 34.

The NCAA argues that because the waiver panel concluded that Bowers did not meet the core course requirement, he is not qualified, even with the assistance of a reasonable modification. Because the

---

**20.** The consent decree was the culmination of an investigation by the Department of Justice into complaints that the NCAA's eligibility rules, specifically the NCAA's treatment of special education courses in determining if an individual met the core course requirement, violated Title III. In the May 1998 consent decree, the NCAA agreed, among other things, to evaluate special education courses not by label, but by content, and to modify its waiver process, including that waiver applications would be reviewed by people with expertise in learning disabilities and that the NCAA would adopt a policy identifying factors that would be considered during the waiver review process.

NCAA has already implemented the individualized waiver review process as a result of the DOJ consent decree, fundamental alteration is not at issue here. What is at issue is whether the waiver review Bowers received was a reasonable modification under the circumstances of this case.

This argument is difficult to fit within the structure of the Title III analysis. As explained above, under Title III, it is a plaintiff's burden to prove the existence of a reasonable modification, and then a defendant has the opportunity to prove that the proffered modification would fundamentally alter the defendant's program. Here, Defendants argue that Plaintiff's proposed accommodation is unreasonable and would fundamentally alter the eligibility requirement. Defendants also argue that they have already presented Bowers with a reasonable accommodation in the form of the individualized waiver review. Because I can not determine whether Bowers's proposed modification would fundamentally alter the NCAA's program because of a lack of evidence regarding whether the eligibility requirements are essential, I am left to analyze the NCAA's argument that they already supplied Bowers with a reasonable accommodation in a vacuum, without the accompanying discussion of whether Bowers's proposed accommodation is reasonable, and whether it would fundamentally alter the NCAA's program. Most cases that address whether a defendant has already provided a reasonable accommodation do so in the context of determining whether a further accommodation proposed by the plaintiff would fundamentally alter the program or service at issue. *See, e.g., Zukle v. Regents of the Univ. of California*, 166 F.3d 1041, 1048–49 (9th Cir.1999); *DeBord v. Board of Educ. of the Ferguson–Florissant Sch. Dist.*, 126 F.3d 1102, 1106 (8th Cir.1997); *McGregor v. Lousiana State Univ. Bd. of Supervisors*, 3 F.3d 850, 855–

58 (5th Cir.1993); *Murphy v. Franklin Pierce Law Ctr.*, 882 F.Supp. 1176, 1182 (D.N.H.1994); *Halasz v. University of New England*, 816 F.Supp. 37, 44 (D.Me. 1993).

Therefore, I will determine whether the individualized waiver review process was a reasonable accommodation, but this determination does not preclude Bowers from pursuing his claim that his 75 percent rule proposed accommodation is reasonable and it does not preclude the NCAA from further pursuing its responsive assertion that Bowers's requested modification would fundamentally alter its eligibility program.

■ While there is no strict test to determine whether an accommodation is reasonable, there are a few established guidelines. Whether an accommodation is reasonable "involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question." *Staron v. McDonald's Corp.*, 51 F.3d 353, 356 (2d. Cir.1995).[21] "Reasonableness is not a constant." *Wynne v. Tufts Univ. Sch. of Med.*, 976 F.2d 791, 795 (1st Cir.1992). Therefore, the issue here is what is reasonable given the specific facts of Bowers's circumstances. The issue is not what would be reasonable in a general sense, but what would be reasonable given the individualized facts before me. *Zukle*, 166 F.3d at 1048.

■ Bowers argues that the waiver procedure is not a reasonable accommodation for several reasons: (1) because the process occurs too late in the recruitment timetable to allow learning disabled students a meaningful opportunity for recruitment if a waiver is granted; (2) because the members of the subcommittee that evaluates waiver applications are unqualified; (3) because the NCAA does not pub-

**21.** While part of the "reasonable" determination can include the "fundamentally alter" analysis, that is not at issue here because the NCAA has already implemented the accommodation at issue (the waiver process) and the NCAA has not argued this accommodation fundamentally alters its program.

licize the availability of the waiver application; (4) because Bowers had no actual or constructive knowledge of the availability of the waiver process during his senior year of high school; (5) because the subcommittee did not have a complete record before it when it considered Bowers's court-ordered waiver application; (6) because Bowers's waiver process came too late in the recruitment process; and (7) because the subcommittee improperly treated Bowers's application.

Bowers's arguments concerning the effect of the waiver procedure generally are easily addressed. As explained above, whether an accommodation is reasonable is an individualized inquiry. The issue is whether the waiver procedure was effective regarding Bowers, not whether the waiver procedure is effective in general. Therefore, Bowers's arguments that the waiver process, on the whole, occurs too late to allow meaningful recruitment, that the NCAA generally does not publicize the existence of the waiver process sufficiently and that, generally, the members of the subcommittee are not qualified to review waiver applications, are not persuasive, because they do not relate to any individualized inquiry.

Bowers's arguments that more directly relate to *his* waiver process, however, will be considered. Those arguments are that the members of the subcommittee that reviewed his waiver application were not qualified, that he had no knowledge of the review process, that his waiver application was reviewed too fast and was based on an incomplete record, that Bowers's waiver occurred too late in the recruitment process and that the subcommittee was overly-skeptical of Bowers's application.

I find Bowers's argument that the members of the subcommittee were unqualified unpersuasive. As I explained in *Bowers II*, the record reflects that the four individuals who considered Bowers's waiver request have considerable experience in the field of learning disabilities: (1) Dr. Bergman holds a doctorate in the field and has been working in the area of learning disabilities for over 35 years; (2) Dr. Raske is the Vice President of Academic Affairs at California State and a specialist in Learning Disabled Affairs; (3) Ms. Sappone holds a Masters Degree in Special Education and has taught IEP programs; and (4) Dr. Berner practices in the field of special education. *See Bowers I*, 974 F.Supp. at 463.

Bowers challenges the qualifications of these individuals because he contends the subcommittee did not contain any members who teach or serve as a school psychologist, because the subcommittee second-guessed the determinations of secondary school employees without seeking their advice or counsel, and because only five student-athletes with learning disabilities were enrolled in Dr. Raske's home university. Pl.'s Rule 56.1 Stmt. ¶¶ 175–78.

I am not persuaded by these arguments. Bowers has not convinced me that whether an individual teaches has any effect on their ability to review a waiver application, or that the fact that Dr. Raske's home university contained five learning disabled athletes holds any significance regarding Dr. Raske's qualifications. Additionally, I conclude that what Bowers alleges to be the subcommittee's role as "second-guesser" is logically what its role in "reviewing" waiver applications should be. In short, Bowers has not persuaded me that the individuals who considered his waiver application were not qualified to do so.

I am also not persuaded by Bowers's argument that his waiver review process was not a reasonable accommodation because his waiver process began too quickly, and was therefore based on an incomplete record. Bowers claims he did not have sufficient time to obtain letters of support from his high school. Pl.'s Rule 56.1 Stmt. ¶ 198. This argument is unpersuasive for two reasons. One, Bowers's waiver review process occurred over the course of one week because I ordered that

the waiver occur on an expedited basis before the preliminary injunction hearing. *Bowers I*, 974 F.Supp. at 465. Two, Bowers's argument that he only had a week to collect letters of support from his high school is not persuasive because Bowers, at the latest, had actual knowledge of the availability of a student-requested waiver when he received the NCAA's June 27, 1997 letter informing him that he was entitled to request a waiver. *See* Exhibits of Defs., Ex. 92 (Letter from J. Freedley Hunsicker, Jr. to Barbara E. Ransom, Esq.) I ordered, on July 10, 1997, that the waiver process would occur. Therefore, Bowers had at least a week's notice prior to my order that a student requested waiver review was available. Additionally, the NCAA has produced evidence that student-requested waivers had been available since August 1996. Defs. Rule 56.1 Stmt. ¶ 153. I do not think that the time frame was unreasonable in Bowers's case, or that it would be unreasonable to expect Bowers to be prepared with such letters, especially because Bowers was in the process of litigation.

Similarly, I am not convinced that the waiver review process was not a reasonable accommodation because Bowers had no knowledge that such a process existed during his senior year of high school. To the contrary, the "1995–96 NCAA Guide for the College–Bound Student–Athlete" expressly informs of the existence of a waiver review process. Exhibits of Defs., Ex. 59 at 5. The language of the brochure informs a student, "You should contact the school recruiting you for more information about this waiver process." *Id.* Therefore, Bowers's assertion that he had no knowledge of the waiver process during his senior year is without merit.

Bowers's argument that his waiver review was somehow mistreated or mishandled by the subcommittee is also unpersuasive. *See* Pl.'s Rule 56.1 Stmt. at ¶ ¶ 208–218. Bowers argues that the subcommittee considered materials that challenged the existence of Bowers's learning disabili-

ty and that the subcommittee received a certification report that failed to give Bowers credit for three special education courses, despite that Bowers had been notified those were courses for which he would receive core course credit. *Id.* at 212. Both of these arguments are not persuasive because the record reflects that the subcommittee ultimately accepted the diagnosis of Bowers's learning disability, and that the subcommittee ultimately received a certification report that correctly reflected the three special education courses as already-designated core-courses. Def's Rule 56.1 Stmt. ¶ 162; Pl.'s Rule 56.1 Stmt.¶ 214.

Bowers's contention that the waiver process occurred too late to be effective for him is more compelling. *See* Pl.'s Rule 56.1 Stmt. at ¶ 199. As I explained in *Bowers II,* the waiver procedure may occur "so late that a student cannot involve himself or herself in fall collegiate athletic programs." 9 F.Supp.2d at 477. I also stated that without the benefit of discovery, it would be impossible to determine whether the waiver procedure is a reasonable accommodation. *Id.* Here, the NCAA has not convinced me that the waiver process did not occur too late for Bowers. The NCAA argues that the timing of the waiver review in Bowers's case does not matter because he was ultimately denied the waiver request. NCAA Reply to Resp. to Mots. Summ. J. at 5. This reasoning is circular and unpersuasive. In Bowers's case, for there to be a possibility that his waiver review process could have been effective, the process would have had to occur at a time when, depending on the result, Bowers could have made effective use of the result. By the time that the NCAA conducted Bowers's review, universities had already dispensed their scholarship money for what would have been Bowers's freshman year. The best that the timing of Bowers's review could have offered him was the chance that an institution might offer him a scholarship in the fall of his sophomore year. I do not find

this to be reasonable, because if Bowers's waiver review had occurred earlier and was successful, Bowers would have had the opportunity to compete for a scholarship for his freshman year.[22] Therefore, I conclude that the waiver review process that the NCAA conducted for Bowers in July 1997 was not a reasonable accommodation as required under Title III of the ADA.

The NCAA also argues that even if it looked beyond the waiver procedure and decided to ignore, theoretically, the special education designations on Bowers's transcript, in other words, if Bowers's courses were evaluated solely under the rules applicable to courses not designated as special education courses, Bowers would still fall short of the core course requirement. NCAA Mem. Supp. Summ. J. at 7, 25.

The NCAA asserts that Bowers only would receive credit for 11.5 core courses even if the NCAA only applied "reasons not truly related to the certification or exclusion of special education courses" to Bowers's transcript.[23] NCAA Mem. Supp. Summ. J. at 25. The NCAA bases this conclusion on the following analysis. The NCAA asserts that Bowers completed eighteen academic courses during high school: Earth Science (SE), English CA (SE), English DC (SE), General Math IA (SE), World Cultures (SE), Biology I(SE), English CB (SE), Spanish I, General Math IB (SE), U.S. History I(SE), Biology II(SE), English (SE), Spanish I (repeated), Pre–Algebra (SE), U.S. History II, English 11/12, Algebra I, and Geometry. *Id.* at 7. Of those courses, the NCAA argues that General Math IA (SE), General Math IB (SE), and Pre–Algebra do not and would not qualify as core courses for any student because they are not "taught at a level equivalent to or above Algebra." *Id.* Additionally, the NCAA maintains that only one Spanish I course would count as a

core course, because no student receives core course credit for repeating a course. *Id.* the NCAA also argues that Biology I(SE) and Biology II(SE) would constitute only one core course because "Palmyra High School specifically stated that each of these courses amounted to only one-half of the full year biology course taught in the regular curriculum." *Id.* For the same reason, the NCAA argues that English DC would constitute only one-half of a core course. Finally, the NCAA maintains that English CA is not a core course because "it is a remedial course with no equivalent in the regular curriculum." *Id.*

While Bowers apparently agrees that he should receive credit for only one Spanish I course, Bowers argues, among other things, that he should receive core course credit for his three pre-algebra math courses because his Individualized Education Program ("IEP") team considered those courses necessary for his individualized instruction based on his learning ability. Pl.'s Rule 56.1 Stmt. at ¶ 14. Bowers also relates that he should receive one course credit for English CA and English DC combined, and that he should receive 1.5 credits for his Algebra I course. *Id.*

The NCAA's argument that Bowers would not have qualified under its eligibility rules even if his courses were evaluated under the rules applicable to all students turns on the treatment of some courses Bowers alleges he enrolled in because of his disability. Bowers's three pre-algebra math courses are an example. Because Bowers argues that he took these classes because of his learning disability, the NCAA's argument that these classes would not be certified as core courses because they are at a level below algebra leads me, in a circular fashion, back to the original question-was Bowers discriminated against because of his disability?

---

**22.** Of course, as explained earlier, there is still a live issue in this case whether Bowers would have received a freshman year athletic scholarship regardless of his eligibility status.

**23.** The NCAA advances this argument but still maintains that "in reality, Bowers was entitled to receive far fewer than eleven and one-half core course units." NCAA Mem. Supp. Summ. J. at 8.

Despite the NCAA's contention that no student would receive core course credit for a pre-algebra class, that does not resolve the question of whether, because of rules such as the pre-algebra rule, the eligibility rules discriminate against learning disabled individuals, by unnecessarily screening out or by refusing to implement a reasonable modification. Therefore, the NCAA's argument that Bowers would not have received qualifier status even if his transcript were treated the same as any student's is not persuasive.

## C. Claims Under the Rehabilitation Act

■ Bowers alleges violations of section 504 of the Rehabilitation Act against all Defendants. See First Am. Compl. ¶¶ 25–29. Section 504 of the Rehabilitation Act, 29 U.S.C. § 794(a), provides, in relevant part:

No otherwise qualified individual with a disability in the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency or by the United States Postal Service.

29 U.S.C. § 794(a). In order to state a claim under section 504, Bowers must prove that: (1) he is disabled; (2) that he is "otherwise qualified" for the benefit sought or for participation in the program; (3) that he was excluded from participation in, denied the benefit of, or subject to discrimination "solely by reason of ... his disability;" and (4) that the "program or activity receives federal financial assistance." Bowers II, 9 F.Supp.2d at 490 (citations omitted). Each Defendant argues it is entitled to summary judgment on Bowers's Rehabilitation Act claims.

### 1. "Receiving Federal financial assistance"

The NCAA, the NCAA Initial–Eligibility Clearinghouse, and ACT move for summary judgment on the ground that they do not receive federal financial assistance and, therefore, that they may not be held liable under section 504. See NCAA Mem. Supp. Summ. J. at 37–43; ACT, Inc./ NCAA Initial–Eligibility Clearinghouse Mem. Supp. Summ. J. at 23–25. Bowers counters that the NCAA is a recipient of federal funds because the NCAA's member institutions receive federal funds and because the NCAA effectively controls and administers the National Youth Sports Program (NYSP), a federally-funded summer enrichment program that operates on the campuses of the NCAA's member institutions. See Pl.'s Resp. to Mots. Summ. J. at 15–22. Bowers further argues that ACT is a recipient of federal financial assistance because of ACT's relationship with the NCAA's member institutions and because ACT administers federal scholarship money. See id. at 19–24.

### a. The NCAA

■ Because it constitutes the most recent appellate court pronouncement on the status of the NCAA as a recipient of federal financial assistance, the Third Circuit's decision in Cureton v. National Collegiate Athletic Ass'n., 198 F.3d 107 (3d Cir.1999), provides a logical starting point for a discussion of the arguments presented by Bowers and the NCAA. Unfortunately, the Third Circuit's decision holds only limited significance for this case.

The plaintiffs in Cureton alleged that the NCAA's initial-eligibility requirements discriminated on the basis of race in violation of Title VI of the Civil Rights Act of 1964. Id. at 111. As with the Rehabilitation Act, Title VI's bar to discrimination applies only to programs or activities receiving federal financial assistance. See 42 U.S.C. § 2000d. The District Court ruled that the NCAA was a recipient of federal financial assistance because it exercised control over the NYSP and because the

NCAA's member institutions, which receive federal funds, vested the NCAA with controlling authority over their athletic programs. *Cureton,* 198 F.3d at 114. Consequently, the District Court denied the NCAA's motion for summary judgment, which was predicated in part on the NCAA's claim that it was not a recipient of federal financial assistance. *Id.* at 111–12. The Third Circuit reversed. *Id.* at 118. The Court of Appeals assumed, without deciding, that the NCAA did, in fact, receive federal funds through its relationship with the NYSP. *Id.* at 114. The Third Circuit found instead that the language of Title VI, which mirrors the language of section 504, is program-specific, meaning that recipients of federal aid are prohibited from discriminating under Title VI only in those programs which receive the aid. *Id.* at 114–15. Consequently, the NCAA could not be held liable under Title VI for discrimination resulting from its initial eligibility rules as a result of its relationship with the NYSP because the NYSP's programs and activities were not in issue in that case. *Id.* at 115.

The Third Circuit's holding in *Cureton* concerning the NCAA's relationship to the NYSP is inapposite here as a result of modifications made to section 504 by the Civil Rights Restoration Act of 1987, Pub.L. No. 100–259, 102 Stat. 28 (1988). In *Grove City College v. Bell,* 465 U.S. 555, 570–71, 104 S.Ct. 1211, 79 L.Ed.2d 516 (1984) and *Consolidated Rail Corporation v. Darrone,* 465 U.S. 624, 104 S.Ct. 1248, 79 L.Ed.2d 568 (1984), decided the same

day, the Supreme Court held that language making Title IX of the Education Amendments of 1972 and section 504 of the Rehabilitation Act applicable to programs receiving federal assistance was program-specific. *Grove City College,* 465 U.S. at 570–71, 104 S.Ct. 1211 (Title IX); *Consolidated Rail Corp.,* 465 U.S. at 635–36, 104 S.Ct. 1248(section 504). In reaching the same conclusion with respect to the same limiting language which appears in Title VI, the Third Circuit relied upon the Court's holding in *Grove City College. Cureton,* 198 F.3d at 114–15. In 1988, however, Congress enacted legislation that abrogated the Supreme Court's decisions in *Grove City College* and *Consolidated Rail Corp.* and aimed to "restore the ... broad, institution-wide application of [Title IX, section 504, Title VI, and the Age Discrimination Act of 1975] as previously administered." Pub.L. No. 100–259, 102 Stat. 28 (1988). In the aftermath of the Civil Rights Restoration Act of 1987, therefore, section 504 of the Rehabilitation Act "prohibit[s] discrimination against the handicapped on an institution-wide basis, instead of only in connection with the limited program or activity actually receiving federal funds...." *Leake v. Long Island Jewish Med. Ctr.,* 695 F.Supp. 1414, 1416 (E.D.N.Y.1988); *see also, DeVargas v. Mason & Hanger–Silas Mason Co.,* 911 F.2d 1377, 1383–85 (10th Cir.1990); *Lussier v. Dugger,* 904 F.2d 661, 664–65 (11th Cir. 1990); *Rothschild v. Grottenthaler,* 716 F.Supp. 796, 798 n. 3 (S.D.N.Y.1989).[24] In

---

**24.** The obvious question arises: In light of the Civil Rights Restoration Act of 1987, how could the Third Circuit in 1999 rule that the language limiting the applicability of Title VI to programs that receive federal assistance bars discrimination only in programs that receive the assistance? The answer, it seems, lies in the fact that *Cureton* involved a claim for disparate impact. *Cureton,* 198 F.3d at 111. A claim for disparate impact arises under Title VI under the regulations implementing that legislation. *Id.* at 113. The Third Circuit reasoned that at the time regulations were crafted by the Departments of Education and Health and Human Services—the two government agencies from whom the NYSP

receives federal block grant monies—those agencies only had the authority to create regulations that were program-specific. *Id.* at 115. In fact, the Third Circuit held that the language of the regulations themselves were explicitly program-specific. *Id.* The Third Circuit acknowledged Congress's later passage of the Civil Rights Restoration Act of 1987 but noted that the regulations which are the source of a disparate impact claim under Title VI were not amended in the aftermath of that legislation. *Id.* at 115–16. The Third Circuit concluded that because the regulations giving rise to a disparate impact claim under Title VI continued to include program-

other words, section 504 of the Rehabilitation Act may bar discrimination by the NCAA as a result of the NCAA's relationship with the NYSP if it is determined that the NCAA receives federal financial assistance as a result of that relationship.

That being said, I must determine whether the NCAA is a recipient of federal funds as a result of its relationship with the NYSP.[25] In *Cureton v. NCAA*, 37 F.Supp.2d 687 (E.D.Pa.1999), the court, confronting the same claim made by Bowers here, concluded the NCAA was an indirect recipient of federal funds because it effectively controlled and operated the NYSP. *Id.* at 694. I am inclined to agree and find that, at the very least, there is a genuine issue of material fact on the record before me as to whether the NCAA controls and operates the NYSP in such a way that it is a recipient of federal financial assistance.

▉ As a threshold matter, I note that an entity may receive federal financial assistance indirectly and still be considered a recipient of federal financial assistance for the purposes of the application of section

specific language, the bar against discrimination embodied in Title VI remained program-specific with respect to such claims. *Id.* The Third Circuit specifically declined to address what significance the Civil Rights Restoration Act of 1987 held for disparate treatment claims arising under Title VI. *See id.*

This case differs from *Cureton* in that Bowers appears to allege a claim for intentional discrimination. *See supra* p. 507. A claim for intentional discrimination under section 504 arises under the statute itself. It is clear that through the Civil Rights Restoration Act of 1987 the Congress expanded—or, to use Congress's word, "restored"—the scope of section 504 to apply on an institution-wide basis. Consequently, where intentional discrimination is alleged, discrimination may be found on the part of a recipient of federal funds even if the program that is the beneficiary of the federal funds is not the program with respect to which the alleged discrimination is alleged.

It is interesting to note in addition that the regulations that implement section 504 and which are analogous to the regulations cited in *Cureton* as implementing Title VI, while seemingly unamended since the passage of

504 of the Rehabilitation Act. *See Grove City College,* 465 U.S. at 564–70, 104 S.Ct. 1211 In *Grove City College,* the Court held that Grove City College was an indirect recipient of federal financial assistance as a result of the federal grant money students attending Grove City College used to pay their tuition bills.[26] *Id.* The Court's decision was predicated upon strong evidence that Congress intended colleges and universities to be the ultimate recipients of the grant money in issue, even if students were the conduits through which the money passed before reaching the College's coffers. *Id.* Consequently, Bowers is not precluded from arguing that the NCAA is an "indirect" recipient of federal financial assistance.

That being said, the intent of the grant-maker is not the only consideration that must be factored into a decision regarding whether or not an entity is a recipient of federal financial assistance. Also relevant to such a decision is the degree of control or authority the alleged recipient of federal funds has over those funds. In *United States Department of Transportation v.*

the Civil Rights Restoration Act of 1987, do not contain language which is program-specific. *Compare* 45 C.F.R. § 84.5 and 34 C.F.R. § 104.5 *with* 45 C.F.R. § 80.4(d)(2) and 34 C.F.R. § 100.4(d)(2).

25. Bowers also argues that the NCAA is a recipient of federal funds because the NCAA's member institutions have ceded "controlling authority" over intercollegiate athletics to the NCAA and because the NCAA's member institutions receive federal funds. The Third Circuit has explicitly rejected this argument as a basis for finding that the NCAA is a recipient of federal financial assistance. *Cureton,* 198 F.3d at 116–18. Consequently, the NCAA can be found to be a recipient of federal financial assistance in this case only if I find that the NCAA receives federal financial assistance through its relationship with the NYSP.

26. While the application of Title IX was at issue in *Grove City College,* the Supreme Court found its reasoning persuasive in *United States Dep't. of Transp. v. Paralyzed Veterans,* a Rehabilitation Act case. 477 U.S. 597, 606–07, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986).

*Paralyzed Veterans of America,* 477 U.S. 597, 106 S.Ct. 2705, 91 L.Ed.2d 494 (1986), the Court held that commercial airlines were not recipients of federal financial assistance under section 504 of the Rehabilitation Act as a result of federal monies allocated by Congress to airport operators. *Id.* at 605–613, 106 S.Ct. 2705. The Court's decision rested principally on the nature of the Rehabilitation Act as Spending Clause legislation. The Court stated that "Congress limited the scope of § 504 to those who actually 'receive' federal financial assistance because it sought to impose § 504 coverage as a form of contractual cost of the recipient's agreement to accept the federal funds." *Id.* at 605–06, 106 S.Ct. 2705. The Court concluded that the commercial airlines could not be considered recipients of federal financial assistance because only the airport operators were "in a position to accept or reject those obligations as a part of the decision whether or not to 'receive' federal funds." *Id.* Thus, whether or not the NCAA is an indirect recipient of federal financial assistance depends not only upon the intent of those government agencies which allocate grant money to the NYSP, *see Cureton,* 198 F.3d at 116 (citing *Grove City College,* 465 U.S. at 563–65 & n. 13, 104 S.Ct. 1211), but also upon the degree to which the NCAA is able to control decisions made with respect to that money, the most important decision of which is whether the grant money should be accepted at all.

There is enough evidence in the summary judgment record before me to conclude that the NCAA has failed to carry its burden of showing that it is not a recipient of federal financial assistance. For example, there is evidence that the NCAA may be in control of the NYSP and the federal funds the NYSP receives. The NYSP was begun in 1969 and was run exclusively by the NCAA until 1989 when a not-for-profit corporation, the National Youth Sports Program Fund ("NYSPF"),[27] was estab-

lished to administer the NYSP. Exhibits of Defs., Ex. 38 ¶¶ 3–4 (Aff. of Edward Thiebe); 107–09, 134 (Articles of Incorporation; Bylaws; Minutes of the First Meeting of the Board of Directors; Certificate of Amendment of Articles of Incorporation). According to a member of the Board of Directors of the NYSPF, however, the NYSPF was established because the NCAA wanted to ensure that it was not a recipient of federal grant dollars or a contractor with the federal government. Exhibits of Pl., Ex. 12a at 32 (Frank Marshall Dep.). In fact, despite the creation of the NYSPF, the NCAA's role with respect to the NYSP has not changed dramatically. By contract with the NYSPF, the NCAA is still responsible for the administration of the NYSP. Exhibits of Defs., Ex. 52 (Agreement between the NYSPF and the NCAA); Exhibits of Pl., Ex. 12a at 51 (Frank Marshall Dep.). The NYSPF pays one dollar per year for these services. Exhibits of Defs., Ex. 52 (Agreement between the NYSPF and the NCAA). The NYSPF has no employees and has never had any employees. Exhibits of Pl., Ex. 12a at 13 (Frank Marshall Dep.). NYSPF documents are in the custody of the NCAA because the NCAA is responsible for the administration of the NYSP. *Id.* at 16. NYSPF's business address is the same as the NCAA's. *Id.* at 42.

More important to the present inquiry than the obvious administrative entanglements that exist between the NCAA and the NYSPF is that the NCAA seems to have the ability to influence significantly how NYSPF's federal funding is spent. The NYSPF Board of Directors is populated by employees of the NCAA. *Id.* at 8, 50–51; Ex. 107 (Note 1 to Financial Statements, 1996 NYSP Financial Report). The Executive Director and Assistant Executive Director of the NCAA are members of the NYSPF Board. The Executive

27. Initially, the National Youth Sports Program Fund was named the National Youth Sports Program Foundation, but this name was changed in 1990. Exhibits of Defs., Ex. 134 (Certificate of Amendment of Articles of Incorporation).

Director of the NCAA is the President of the NYSPF. Exhibits of Defs., Ex. 108 (Bylaws of NYSPF); Exhibits of Pl., Ex. 12a at 73 (Frank Marshall Dep.). The Board of Directors is exclusively responsible for making decisions concerning the actions of the NYSPF. Exhibits of Defs., Ex. 107 (Articles of Incorporation of NYSPF). This Board has not found it necessary more than once in the history of the NYSPF to meet in person. Exhibits of Pl., Ex. 12a at 10, 72–73, 77 (Frank Marshall Dep.). Given the NCAA's continued involvement in the NYSP, not only in its role administering the program but also the role of its personnel in managing the NYSPF, it is no surprise that the Executive Director of the NCAA describes the NYSP this way: "NYSP is one of the NCAA's best-kept secrets.... Our partnership with the federal government ... perfectly embodies the NCAA's team spirit." *Id.*, Ex. 107 (Comment of Cedric W. Dempsey, NCAA Executive Director, 1996 NYSP Financial Report).

While it is true that non-NCAA employees appear to participate on NYSPF's Board of Directors as well, these participants, who constitute the so-called "NYSP Committee," *id.*, Ex. 107 (Note 1 to Financial Statements, 1996 NYSP Financial Report); Ex. 12a at 8, 50–51 (Frank Marshall Dep.), have unmistakable ties to the NCAA. They are reimbursed by the NCAA for expenses incurred relating to work performed on behalf of the NYSP. *Id.*, Ex. 12 at 69–71 (Frank Marshall Dep.). They consult with NCAA staff members before determining which universities and colleges should be sub-granted money to host and administer NYSP programs. *Id.*, Ex. 8 at 126 (Tina Sloan Green Dep.). Finally, when these committee members lobby on behalf of the NYSPF for federal funding, they are organized by NCAA staffers. *Id.*, Ex. 8 at 132. Thus, it seems that the NCAA is in a position to exercise significant influence over decision-making at the NYSPF.

That being said, it is not as if the NCAA is without argument. Admittedly, evidence has not been provided which would indicate that the NCAA has the type of formal authority to control the expenditure of federal grant money that in other cases been found sufficient to declare an entity a recipient of federal financial assistance. *See, e.g., Horner v. Kentucky High Sch. Athletic Ass'n.*, 43 F.3d 265, 272 & n. 5 (6th Cir.1994). In addition, any fair reading of the record reveals that the NYSP does not provide any funds to the general operating account of the NCAA, the NYSPF does file its own tax returns, and the staff members of the NCAA who are consulted when the NYSP Committee considers how it should spend its federal dollars do not vote on how the money ultimately will be spent. *See* Exhibits of Pl., Ex. 8 at 126 (Tina Sloan Green Dep.); Ex. 12 at 80 (Frank Marshall Dep.); Ex. 93 (N.Y.SPF "Return of Organization Exempt from Income Tax"). Nonetheless, there is sufficient evidence on this record to suggest that the NCAA exercises an amount of informal control over the manner in which the NYSPF obtains funding and then distributes that funding to raise a genuine issue of material fact as to whether the NCAA is a recipient of federal financial assistance. To ignore this evidence and hold that the NCAA does not exercise control over the NYSPF's federal funding would be to elevate form over substance in a way that should not be countenanced. *See Grove City College*, 465 U.S. at 564, 104 S.Ct. 1211; *Horner*, 43 F.3d at 272. While I in no way suggest that anything about the arrangement between the NCAA and the NYSPF is inappropriate, I do find that a genuine issue of material fact exists as to whether that arrangement has not left the NCAA with effective control over the NYSPF.

With respect to whether those agencies that make grants to the NYSPF intend the NCAA to be the recipient of those grants, the record before me is sparse. The record does suggest, however, that grantmakers at least share this Court's percep-

tion that the NCAA may exert significant control over the NYSPF. In evidence provided by the NCAA, a letter from the United States Department of Health and Human Services awarding a grant to the NYSPF states: "I am pleased to inform you that your organization's application dated February 23, 1993, to support the National Youth Sports Program Fund *under the National Collegiate Athletic Association* has been approved in the amount of $9,424,000." *See* Exhibits of Defs., Ex. 54 (Apr. 9, 1993 Letter from Department of Health and Human Services) (emphasis added). Grant-makers are not the only ones who share this Court's perception. The NCAA introduces evidence that the NYSPF has its own insurance, yet the named insured on the policy is the "National Collegiate Athletic Association d/b/a National Youth Sports Program." Exhibits of Defs., Ex. 110 (Policy Declaration by Transamerica Insurance Services). The policy states that it provides coverage for the "NCAA National Youth Sports Program." *Id.* In sum, a genuine issue of material fact exists as to whether the NCAA is an indirect recipient of federal financial assistance.

### b. ACT/Clearinghouse

■ ACT/Clearinghouse moves for summary judgment on Bowers's Rehabilitation Act claim also on the ground that it does not receive federal financial assistance. Bowers challenges ACT/Clearinghouse's motion with two arguments: (1) that ACT/Clearinghouse is the recipient of federal financial assistance because it is an assignee of federally funded colleges and

universities who have ceded controlling authority to ACT/Clearinghouse; and (2) that ACT/Clearinghouse is the recipient of federal financial assistance through administration of certain scholarship programs.[28] Pl.'s Resp. to Mots. Summ. J. at 21–24.

I conclude that ACT/Clearinghouse is not a recipient of federal financial assistance under the terms of the Rehabilitation Act under either of Bowers's arguments. Accordingly, ACT/Clearinghouse's motion for summary judgment is granted on Bowers's Rehabilitation Act claim.

As the above discussion regarding the NCAA's status as a recipient under section 504 indicates, the Third Circuit has rejected the "controlling authority" argument in the context of the NCAA. *See supra* n. 25; *Cureton,* 198 F.3d at 116–18. In *Cureton,* the Third Circuit rejected the argument that the NCAA's member institutions ceded sufficient control to the NCAA such that the NCAA became a recipient of federal financial assistance. Therefore, it would be illogical for this Court to conclude that NCAA member institutions have, however, ceded sufficient control to an organization that merely contracts with the NCAA to carry out some of the NCAA's activities.[29]

Bowers's second argument is that ACT/Clearinghouse is a recipient of federal financial assistance because "it is paid to administer four scholarship programs, all funded through the federal government." Pl.'s Resp. to Mots. Summ. J. at 22. Bowers explains that "the scholarship programs themselves undisputably constitute federal financial assistance." *Id.* Bowers

**28.** Bowers claims that ACT/Clearinghouse is a recipient of federal financial assistance through its administration of the Presidential Scholars Program, the Harry S. Truman Scholarship, the Barry M. Goldwater Scholarship, the James Madison Scholarship and the Morris K. Udall Scholarship. Pl.s Resp. to Mots. Summ. J. at 22.

**29.** I note here that even if the NCAA is eventually found to be a "recipient" under the Rehabilitation Act due to its relationship with NYSP, that possibility does not affect my anal-

ysis here. ACT/Clearinghouse's contractual relationship with the NCAA to provide eligibility determination services would not impute to ACT/Clearinghouse the status of "recipient." *See O'Keefe v. Niagara Mohawk Power Corp.,* 714 F.Supp. 622 (N.D.N.Y.1989)(holding that employer who contracted with a recipient of federal financial assistance under the Rehabilitation Act was not a Rehabilitation Act "recipient" solely due to its contractual relationship with a "recipient.")

supports his contention with the argument that "the federal government, acting in its unique role of promoting higher education, established these programs to benefit certain college students. The federal government receives no direct benefit from its funding of these programs, nor does it receive any benefit from ACT's administration of these scholarships." *Id.* Finally, citing *United States v. Baylor University Medical Center*, 736 F.2d 1039 (5th Cir. 1984), Bowers asserts that "when a program administers or provides services that constitute federal financial assistance, that program is deemed to be a recipient of that assistance and is covered under Section 504." *Id.* at 23.

██ In order for ACT/Clearinghouse to be a recipient of federal financial assistance based on its relationship with the scholarships at issue, however, ACT/Clearinghouse must receive a subsidy from the federal government. *Bowers II* 9 F.Supp.2d at 493; *DeVargas v. Mason & Hanger–Silas Mason Co.*, 911 F.2d 1377 (10th Cir.1990); *Bachman v. American Society of Clinical Pathologists*, 577 F.Supp. 1257, 1264 (D.N.J.1983)(explaining that "the term 'assistance' connotes a transfer of government funds by way of subsidy"). If the federal government intended to provide compensation only and not a subsidy, ACT/Clearinghouse is not a "recipient" under the Rehabilitation Act. *DeVargas*, 911 F.2d at 1382.[30] A simple compensatory contractual relationship with the federal government does not make the contracting party a recipient of federal financial assistance. *Id.; Hingson v. Pacific Southwest Airlines*, 743 F.2d 1408 (9th Cir.1984)(holding that contract to carry government mail does not impute "recipient" status to contractor unless the contract involves a subsidy).

While Bowers may correctly state that the scholarship programs at issue here are federal financial assistance, I must determine if ACT/Clearinghouse is the intended recipient of that assistance. As explained above regarding the NCAA, *Paralyzed Veterans* establishes that despite any disbursement pattern, a determination of whether an organization is a recipient of federal financial assistance is at least partially based on who Congress intended to receive the funding at issue. 477 U.S. at 606–07, 106 S.Ct. 2705. In accord is *Grove City College.* As explained above, there, the Supreme Court determined that despite a disbursement pattern where federal student financial aid funds were sent to college students, the ultimate intended recipient of the federal subsidy was the college. *Id.* at 564–66, 104 S.Ct. 1211.

*Paralyzed Veterans* also supports the view that the term "recipient" does not extend to mere beneficiaries of a federal subsidy. 477 U.S. at 606–07, 106 S.Ct. 2705. In *Paralyzed Veterans*, organizations representing disabled individuals challenged the Civil Aeronautics Board's determination that it could not regulate commercial airlines under the Rehabilitation Act. *Id.* at 602–03, 106 S.Ct. 2705. The organizations argued that federal grants to airport operators were "simply converted into nonmoney grants to airlines" through construction of runways and other airport facilities. *Id.* at 606, 106 S.Ct. 2705. The organizations argued the commercial airlines were therefore "indirect recipients" of federal financial assistance under the Rehabilitation Act. *Id.* The Supreme Court disagreed, determining that commercial airlines were mere beneficiaries of federal subsidies to airport operators and that, therefore, the airlines were not "recipients" under the Rehabilitation

---

**30.** In *DeVargas,* the plaintiff sued an employer under the Rehabilitation Act for the employer's refusal to hire the plaintiff. The employer held a contract with Los Alamos National Laboratory, a federally funded entity, to provide security personnel. The Tenth Circuit concluded that the employer was not a recipi-ent of federal financial assistance under the Rehabilitation Act because the employer's contract to provide security services to Los Alamos National Laboratories was compensatory and did not involve a subsidy. 911 F.2d at 1382.

Act. The Court reasoned that the intended recipients of the funding were the airport operators and that simply because the airlines enjoyed the use of facilities provided by the operators, and funded by the federal subsidy, did not make the airlines "recipients" under the Rehabilitation Act.[31] 477 U.S. at 606–07, 106 S.Ct. 2705.

Bowers cites *Baylor*, a Fifth Circuit opinion, in support of the proposition that because ACT/Clearinghouse administers the provision of federal financial assistance, it is covered by the Rehabilitation Act. In *Baylor*, the Fifth Circuit deemed a private, non-profit hospital a recipient of federal financial assistance under the Rehabilitation Act because it received Medicaid and Medicare reimbursement for hospital and health care services it provided to some patients. 736 F.2d at 1045–47.

I find that *Baylor* is distinguishable from this case. In *Baylor*, the hospital was the ultimate recipient of a federal subsidy for purposes of the Rehabilitation Act. The federal government subsidizes patient care through Medicare and Medicaid. The intended recipient of the subsidy is the hospital. 736 F.2d at 1047. According to the analysis of *Paralyzed Veterans*, *Grove City College* and *DeVargas*, ACT is not the recipient of any federal subsidy. It is merely compensated for its services in administering the payment of a federal subsidy to others.[32] ACT receives no benefit from the subsidy other than the compensatory benefits it receives in return for its services. The hospitals in *Baylor* received the benefit of the subsidy. ACT does not receive the scholarship money. It is only compensated in return for fulfilling its contractual obligations.

I denied ACT/Clearinghouse's first motion for summary judgment on this issue so that Bowers could conduct discovery to determine if ACT/Clearinghouse's financial relationship with the federal government went beyond mere compensatory contract to constitute a subsidy. *Bowers II*, 9 F.Supp.2d at 493.

Both Bowers and ACT/Clearinghouse cite to the testimony of Joe Pugh, Vice President for Business and Finance and Corporate Treasurer of ACT, to support their respective positions.

Pugh's testimony reveals that ACT was hired to administer the scholarships at issue. In his testimony, Pugh describes that in administering the scholarships, ACT/Clearinghouse assists in the preparation and distribution of scholarship materials, develops databases, tracks applications and assists in making the awards. Exhibits of Defs., Ex. 17 at 20–40 (Pugh Dep.). Additionally, Pugh's testimony indicates that ACT/Clearinghouse periodically competitively bids for scholarship administration contracts. *Id.* at 20. This testimony supports the conclusion that payment from the federal government to ACT regarding these scholarships is payment for services rendered, and not a subsidy.

I conclude that Bowers has not presented any evidence that the administration of the scholarships by ACT/Clearinghouse represents anything more than a compensatory contractual relationship between ACT/Clearinghouse and the federal government. ACT has not received a federal subsidy. At best, its contractual relationship is a benefit generated by the federal subsidy granted to the scholarship recipients.

In sum, because the undisputed evidence contained in the summary judgment rec-

---

**31.** Congress responded to the Supreme Court's decision in *Paralyzed Veterans* with 49 U.S.C. section 41705. That statute forbids discrimination by air carriers against otherwise qualified handicapped individuals. The statute, however, does not invalidate the Supreme Court's reasoning in reaching its conclusion in *Paralyzed Veterans*. By enacting 49 U.S.C. section 41705, Congress established a new method to prevent discrimination by airline carriers.

**32.** In the context of the scholarships at issue, I do not determine who would be a Rehabilitation Act "recipient." My analysis here is limited to determining whether ACT/Clearinghouse is a "recipient."

ord reveals that ACT/Clearinghouse is a contractor with the federal government who receives compensation and not subsidy, I conclude that ACT/Clearinghouse is not a "recipient" of federal financial assistance under the Rehabilitation Act. Accordingly, ACT/Clearinghouse's motion for summary judgment on Bowers's Rehabilitation Act claim is hereby granted.

### 2. "Otherwise qualified individual" / "Solely by reason of his or her disability"

■ All Defendants argue that they are entitled to summary judgment on Bowers's Rehabilitation Act claim because Bowers was not an "otherwise qualified individual" who was discriminated against "solely by reason of his or her disability." [33] This argument and Defendants' arguments regarding Bowers's ADA claim are symbiotic. For the reasons explained above in my analysis of Defendants' arguments in support of their motions for summary judgment on Bowers's ADA claims,[34] I will deny Defendants' motions for summary judgment regarding whether Bowers was "otherwise qualified" and whether Bowers was discriminated against by reason of his disability.

### D. The NJLAD

Bowers alleges violations of the New Jersey Law Against Discrimination ("NJLAD")on the part of Defendants NCAA and ACT/Clearinghouse.[35] The NJLAD provides, in relevant part, that it shall be unlawful discrimination:

[f]or any owner, lessee, proprietor, manager, superintendent, agent, or employee of any place of public accommodation directly or indirectly to refuse, withhold from or deny to any person any of the accommodations, advantages, facilities or privileges thereof, or to discriminate against any person in the furnishing thereof, or directly or indirectly to publish, circulate, issue, display, post or mail any written or printed communication, notice, or advertisement to the effect that any of the accommodations, advantages, facilities, or privileges of any such place will be refused, withheld from, or denied to any person on account of the race, creed, color, national origin, ancestry, marital status, sex, affectional or sexual orientation or nationality of such person, or that the patronage or custom thereat of any person of any particular race, creed, color, national origin, ancestry, marital status, sex, affectional or sexual orientation or nationality is unwelcome, objectionable or not acceptable, desired or solicited, and the production of any such written or printed communication, notice or advertisement, purporting to relate to any such place

33. I need not address ACT/Clearinghouse's challenge to this aspect of Bowers's Rehabilitation Act claim, as I have already granted ACT/Clearinghouse's motion for summary judgment, determining that it is not the recipient of Federal financial assistance and therefore not subject to the Rehabilitation Act.

34. All parties agree that the "otherwise qualified" and "solely by reason of" analysis under the Rehabilitation Act is substantially similar to the "qualified", "by reason of" and "discriminated against on the basis of disability" analysis under the ADA. Pl.'s Resp. to Mots. Summ. J. at 29; NCAA Mem. Supp. Summ. J. at 23. See also Menkowitz v. Pottstown Memorial Medical Ctr., 154 F.3d 113, 120 (3d Cir.1998)(explaining relationship between Rehabilitation Act and Title III of the ADA); Yeskey v. Commonwealth of Pa. Dept. of Corr.,

118 F.3d 168, 170 (3d Cir.1997)(explaining relationship between Rehabilitation Act and Title II of the ADA).

35. There is some confusion regarding whether Temple, Iowa and AIC are included in Bowers's NJLAD claim, as that claim is presented in Bowers's First Amended Complaint. Bowers has since moved to amend his First Amended Complaint to clarify that these three defendants are included under the NJLAD claim. It appears from these university Defendants' briefs that if the NJLAD claim does include them, they would join the NCAA's arguments. Because that is unclear, however, I will not specifically include those Defendants in this current NJLAD discussion. Moreover, I will not address Bowers's motion to amend in this opinion.

and to be made by any owner, lessee, proprietor, superintendent or manager thereof, shall be presumptive evidence in any action that the same was authorized by such person

N.J.S.A. 10:5–12(f). All of the provisions of the NJLAD apply to unlawful discrimination against "any person because such person is or has been at any time handicapped." N.J.S.A. 10:5–4.1; *see also* N.J.A.C. 13:13–4.2.

The NCAA argues it is entitled to judgment as a matter of law because the NJLAD is not applicable in this case for the following reasons: (1) because Bowers was not barred access to a place of public accommodation in New Jersey; (2) because the NCAA is not a place of public accommodation under the NJLAD; and (3) because Bowers was not discriminated against because of his disability. ACT/Clearinghouse joins the NCAA's arguments and also argues that it is not subject to liability under the NJLAD for aiding and abetting.

Bowers, of course, disagrees, arguing that the NJLAD is applicable to this case, and that both the NCAA and ACT/Clearinghouse are places of public accommodation as that concept is defined under New Jersey law. Bowers does not directly address the aiding and abetting claim in his response to the summary judgment motions before me.[36]

The threshold issue for resolution is the NCAA's argument that the NJLAD is not applicable because the NJLAD may not govern a situation where a New Jersey resident seeks access to a public accommodation[37] outside of New Jersey. The NCAA contends that to apply the substance of the NJLAD here would amount to an improper extraterritorial application of state law, because New Jersey may not regulate conduct that occurs beyond its boundaries.

While no Defendant or Plaintiff discussed this issue sufficiently in depth in their briefs, my own research has revealed that the issue of extraterritorial application of state law is subject to at least two methods of analysis. One method is triggered when a party challenges a court's conclusion, resulting from a choice of law analysis, to apply the law of a certain state on the ground that the application of that state's law violates due process considerations. The other method of analysis is triggered in the context of the dormant Commerce Clause, when litigants contend that a state regulation unconstitutionally regulates commerce occurring outside of that state.

In the choice of law context, the United States Supreme Court has employed a "contacts" analysis, similar to that used in the personal jurisdiction context, to determine whether a particular state's substantive law has been constitutionally applied to a particular set of facts. In *Allstate Insurance Company v. Hague*, the Supreme Court determined "that for a State's substantive law to be selected in a constitutionally permissible manner, that State must have a significant contact or significant aggregation of contacts, creating state interests, such that choice of its law is neither arbitrary nor fundamentally unfair." 449 U.S. 302, 312–13, 101 S.Ct. 633, 66 L.Ed.2d 521 (1981). The Court explained that it "has invalidated the choice of law of a State which has had no significant contact or significant aggregation of contacts, creating state interests,

---

**36.** Bowers did file a motion to file a surreply and an accompanying brief. Defendants' objected to that motion. The issue of ACT/Clearinghouse's liability for aiding and abetting, among other issues, is discussed within that surreply brief. I will grant Bowers's motion to file his surreply. I note, however, that its contents did not change the rulings set forth in this opinion.

**37.** As explained, the NCAA challenges that even if the NJLAD is properly applicable to the facts presently before me, the NCAA is not a place of public accommodation under the NJLAD.

with the parties and the occurrence or transaction." 449 U.S. at 308, 101 S.Ct. 633.[38]

Therefore, under this method of analysis, to determine whether a state's substantive law may constitutionally apply to an occurrence or transaction, the relationship of the state whose law is to be applied to the facts at issue must be examined. No party to this present action has fully addressed or applied this mode of analysis.

As explained above, courts have also employed a dormant Commerce Clause analysis to examine claims of impermissible extraterritorial effects. In this case, the dormant Commerce Clause analysis would require this Court to determine whether the NJLAD would impermissibly regulate commerce that occurs outside of New Jersey's borders if applied to the factual scenario present here. See, e.g., Healy v. Beer Institute, 491 U.S. 324, 109 S.Ct. 2491, 105 L.Ed.2d 275 (1989). For example, the New Jersey Supreme Court and the Third Circuit have analyzed whether application of the New Jersey Franchise Practices Act to franchise activities in states other than New Jersey would offend the dormant Commerce Clause. Instructional Systems, Inc. v. Computer Curriculum Corp., 130 N.J. 324, 614 A.2d 124 (1992); Instructional Systems, Inc. v. Computer Curriculum Corp., 35 F.3d 813 (3d Cir.1994). These cases make apparent that an extraterritorial analysis under the dormant Commerce Clause requires, among other inquiries, an analysis of whether the New Jersey legislature intended the statute or regulation at issue to have an extraterritorial effect, determining which dormant Commerce Clause standard of review is applicable,[39] and once that standard is determined, ultimately con-

cluding whether application of the statute or regulation to the facts at issue would offend the dormant Commerce Clause. No party undertook such analysis in any brief filed with this Court.

Because no party has fully briefed the issue of the potential extraterritorial application of the NJLAD and the potential applicability of either the choice of law or dormant Commerce Clause methods of analysis, I will not decide this issue at this time. I shall deny the motions for summary judgment on Bowers's NJLAD claim without prejudice. Plaintiff and Defendants will have twenty days from the date of this Opinion to submit additional briefs on this issue.

Accordingly, because I can not determine the threshold issue of applicability of the NJLAD based on the record before me, I shall not decide at this time whether the Defendants are places of accommodation under the NJLAD and whether ACT/Clearinghouse is subject to liability for aiding and abetting under the NJLAD. I will also defer ruling on whether Defendants' violated the NJLAD's prohibition on discrimination because of an individual's disability.

### E. *Breach of Contract Claim*

Finally, ACT/Clearinghouse moves for summary judgment on Bowers's breach of contract claim. See First Am. Compl. at ¶¶ 246–54. Bowers alleges that his payment of an $18 fee in connection with his application to the Clearinghouse created, under New Jersey law, a contract between ACT/Clearinghouse and Bowers. Id. at ¶¶ 116, 247 & p.38 (demanding remedies under New Jersey law). The contract, he alleges, provided that the Clearinghouse would determine Bowers's initial

**38.** There are other cases that are potentially relevant to this mode of analysis. See Phillips Petroleum Co. v. Shutts, 472 U.S. 797, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985); Blakey v. Continental Airlines, Inc., 164 N.J. 38, 751 A.2d 538 (2000); McCluney v. Jos. Schlitz Brewing Co., 649 F.2d 578 (8th Cir.1981); Wright v. Xerox Corp., 882 F.Supp. 399 (D.N.J.

1995). This list is by no means exclusive or conclusive.

**39.** See, e.g., Juzwin v. Asbestos Corp., Ltd., 900 F.2d 686, 689 (3d Cir.1990)(describing different standards of review under dormant Commerce Clause analysis).

eligibility in accordance with the materials published by the NCAA and the Clearinghouse. *Id.* He also alleges that the Clearinghouse breached that contract by, *inter alia:* (1) failing to provide Bowers or his high school with information sufficient to allow Bowers to comply with the NCAA's core course requirement; (2) failing to notify Bowers that his special education courses would not and could not be considered core courses without further action by the NCAA and without the submission of further information to the Clearinghouse; and (3) failing to notify Bowers that he would require a waiver to meet the initial eligibility requirements or that a waiver procedure existed. *Id.* at ¶ 249. Bowers also alleges that ACT/Clearinghouse acted in bad faith, and "unreasonably and arbitrarily" in the processing of Bowers's application, *id.* at ¶¶ 250–51, 253, and that they imposed "additional, time-consuming, and more burdensome requirements on his application," *id.* at ¶ 252. *See also id.* at ¶ 225 (alleging existence of an "unduly burdensome process, which the NCAA and its member schools have imposed on students with learning disabilities to determine their eligibility to participate in intercollegiate athletics").

ACT/Clearinghouse deny that any contract existed between itself and Bowers and, alternatively, they assert that if such a contract existed, ACT/Clearinghouse performed exactly what any contract with Bowers could reasonably have required, that is, to evaluate Bowers's information based on the NCAA's criteria and report the results. *See* ACT/Clearinghouse Mem. Supp. Summ. J. at 14–16.

I will grant ACT/Clearinghouse's motion for summary judgment on Bowers's breach of contract claim. The dispute regarding the breach of contract claim surrounds not what happened, but whether a contract existed between ACT/Clearinghouse and Bowers, and if so, whether ACT/Clearinghouse breached the contract. Bowers claims that the two documents "1995–96 NCAA Guide for the College–Bound Stu-

dent Athlete" and "Making Sure You Are Eligible to Participate in College Sports" contain the terms of the alleged contract between Bowers and ACT/Clearinghouse. *See* First Am. Compl. ¶ 247. ACT/Clearinghouse, on the other hand, argues no consideration was present. It claims that the $18 fee is the property of the NCAA such that it may not form the basis of a contract between ACT/Clearinghouse and Bowers. ACT/Clearinghouse Mem. Supp. Summ. J. at 33.

Bowers's submission of his Student Release Form and fee check did create a contractual obligation between ACT/Clearinghouse and Bowers. ACT/Clearinghouse stated, in its brief, that the NCAA receives the $18 payment and funds ACT's operation of the Clearinghouse. *Id.* at 33. Therefore, I hold that there was consideration, however small, as the $18 payment allows ACT/Clearinghouse to maintain its operations no matter if the $18 is directly or indirectly received by ACT/Clearinghouse.

The question then begs what were the terms of the contract between Bowers and ACT/Clearinghouse? The terms of the contract consist of the information provided in the two brochures. ACT/Clearinghouse's "Making Sure You Are Eligible to Participate in College Sports" brochure explains what information and materials a student-applicant must provide to the Clearinghouse. Exhibits of Defs., Ex. 51. A student must submit a completed and signed student release form, the $18 fee, an official high school transcript and the student's SAT or ACT scores. The brochure also instructs the student when to start the application process, informs the student of the NCAA requirements for certification by the Clearinghouse, guides the student through completing the Student Release Form and explains what happens to a complete Student Release Form after it is submitted to the Clearinghouse. The brochure also describes the information necessary for the Clearinghouse to

process a nonstandard testing conditions administration of the ACT or SAT. *Id.*

The NCAA brochure "1995–96 NCAA Guide for the College–Bound Student–Athlete" provides detailed information regarding the NCAA's academic eligibility requirements and the certification process that occurs through the Clearinghouse, including an explanation about the availability of a waiver review process. Exhibits of Defs., Ex. 59.

In summary, the terms of the contract between Bowers and ACT/Clearinghouse were that if Bowers properly submitted the Student Release Form, paid the fee and submitted all of the necessary documentation, then ACT/Clearinghouse would determine his eligibility according to the NCAA rules of eligibility and report the determination to Bowers.

The undisputed evidence in the summary judgment record shows, as a matter of law, however, that ACT/Clearinghouse did not breach this agreement. ACT/Clearinghouse performed as required under the contract. ACT/Clearinghouse received Bowers's Student Release Form and processed Bowers's eligibility accordingly.

As detailed in *Bowers II*, 9 F.Supp.2d at 468–69, ACT/Clearinghouse contacted Bowers and/or Palmyra High School in an attempt to secure missing information. At best, Bowers has produced evidence of a miscommunication between ACT/Clearinghouse and Palmyra High School regarding what documentation ACT/Clearinghouse needed to assess Bowers's eligibility. The brochures do not appear to impose an obligation on ACT/Clearinghouse to ensure that a high school or an applicant provides ACT/Clearinghouse with all necessary materials or that the application conforms to the rules of application for certification. The brochures also do not establish an obligation that ACT/Clearinghouse must shepherd an applicant through the eligibility process.

Also, Bowers has presented no evidence, and no reasonable fact-finder could determine, that ACT/Clearinghouse acted in bad faith to prevent Bowers from receiving the fruits of his contract with ACT/Clearinghouse. Plaintiff has presented no evidence of wrongful motive, fraud or an intent to mislead or deceive on the part of ACT/Clearinghouse. ACT/Clearinghouse did contact Palmyra High School in an attempt to conform Bowers application to that necessary to evaluate Bowers's eligibility in accordance with the NCAA's rules. Plaintiff seems to contend that ACT/Clearinghouse bore full responsibility for seeking and confirming that it possessed all necessary information to process Bowers's application, otherwise it would be acting in bad faith. The brochures simply do not impose such a duty and neither does New Jersey law.

Accordingly, because the undisputed summary judgment record shows that ACT/Clearinghouse fulfilled all of its obligations under its contract with Bowers and the record is devoid of evidence of any bad faith on the part of ACT/Clearinghouse, I will grant ACT/Clearinghouse's motion for summary judgment on Bowers's breach of contract claim.

## III. CONCLUSION

For the reasons stated above, the motions of the NCAA, AIC, Temple and Iowa for summary judgment regarding Count I(ADA) will be denied; the motions for summary judgment of the NCAA, Temple, Iowa and AIC on Count II (Rehabilitation Act) will be denied; the motion of ACT/Clearinghouse for summary judgment on Count II (Rehabilitation Act) will be granted; the motions for summary judgment of the NCAA and ACT/Clearinghouse on Count IV (NJLAD) will be denied without prejudice; and ACT/Clearinghouse's motion for summary judgment on Count VI (Breach of Contract) will be granted. Additionally, I will deny summary judgment on the issues of standing and the recoverability of damages, with

the exception that I will grant summary judgment on the issue that certain damages sought by Bowers are too speculative, and I will defer my decision regarding whether Bowers may recover compensatory damages against Temple and Iowa until Bowers's pending motion to amend his First Amended Complaint is resolved.

## ORDER

This matter having come before the Court on the motions of Defendants National Collegiate Athletic Association, ACT, Inc., NCAA Initial Eligibility Clearinghouse, Temple University of the Commonwealth System of Higher Education, University of Iowa and American International College, for summary judgment, pursuant to Federal Rule of Civil Procedure 56(c), Barbara E. Ransom, Esq. Of the Public Interest Law Center of Philadelphia, and Richard L. Bazelon, Esq. of Bazelon & Less, appearing on behalf of Plaintiff Michael Bowers, and Charles J. Vinicombe, Esq., J. Freedley Hunsicker, Jr., Esq., John Schultz, Esq., Julianne Peck, Esq., Amy E. Pizzutillo, Esq. of Drinker, Biddle & Shanley LLP, appearing on behalf of Defendant National Collegiate Athletic Association, and Robert A. Burgoyne, Esq., Karen M. Moran, Esq. of Fulbright & Jaworski LLP, Nicholas M. Kouletsis, Esq. of Pepper, Hamilton, LLP, appearing on behalf of Defendant ACT, Inc. and NCAA Initial Eligibility Clearinghouse, and Mark Schantz, Esq., Andrew Ives, Esq. of Office of the General Counsel of the University of Iowa, and Thomas J. Miller, Esq., Attorney General, Gordon E. Allen, Esq., Deputy Attorney General, Office of the Iowa Attorney General, William O. Perkins, Jr., Esq., Margulies, Wind, Herrington & Knopf, P.C., appearing on behalf of Defendant University of Iowa, and John B. Langel, Esq., Abigail L. Flitter, Esq. of Ballard Spahr Andrews & Ingersoll, LLP, appearing on behalf of Defendant Temple University of the Commonwealth System of Higher Education, and Thomas C. Hart, Esq. of Ruprecht &

Hart, LLP, appearing on behalf of Defendant American International College; and

The Court having considered the submissions of the parties, for the reasons set forth in the OPINION filed concurrently with this ORDER;

IT IS, on this 2nd day of November, 2000, hereby ORDERED that:

1. The motions for summary judgment of Defendants National Collegiate Athletic Association, American International College, Temple University of the Commonwealth System of Higher Education, and University of Iowa are DENIED on Bowers's Count I (Americans With Disabilities Act).

2. The motions for summary judgment of Defendants National Collegiate Athletic Association, American International College, Temple University of the Commonwealth System of Higher Education, and University of Iowa are DENIED on Bowers's Count II (Rehabilitation Act).

3. The motion of Defendant ACT, Inc. and NCAA Initial Eligibility Clearinghouse for summary judgment is GRANTED on Bowers's Count II (Rehabilitation Act).

4. The motions for summary judgment of Defendants National Collegiate Athletic Association and ACT, Inc. and NCAA Initial Eligibility Clearinghouse on Bowers's Count IV (New Jersey Law Against Discrimination) are DENIED WITHOUT PREJUDICE.

5. The motion for summary judgment of Defendant ACT, Inc. and NCAA Initial Eligibility Clearinghouse is GRANTED on Bowers's Count VI (Breach of Contract).

6. Defendants' challenges to standing and the recoverability of damages are DENIED IN PART AND GRANTED IN PART, GRANTED with respect to the argument that

damages for loss of a future athletic career are too speculative but DE-NIED in all other respects.

7. Plaintiff and Defendants will have twenty days from the date of this order to submit further briefing on Bowers's Count IV (New Jersey Law Against Discrimination), the briefing will address those issues detailed in the Opinion filed concurrently with this Order.

8. Plaintiff's motion to file a surreply is GRANTED.